[No. 18632.  Department Two.  May 29, 1925.]

# J. H. DeHoney *et al., Respondents,* v. Peder P. Gjarde *et al., Appellants.*[1]

New Trial (25)—Grounds—Excessive Damage. A verdict for $14,500 for damages for breach of a building contract cannot be said to be the result of passion or prejudice, where there was evidence to sustain all of plaintiff's claims in the amount of $15,676.

Same (22)—Grounds—Insufficiency of Evidence. Undue influence of passion and prejudice cannot be based on insufficiency of conflicting evidence, where there was substantial evidence supporting plaintiff's claims.

Same (11)—Grounds—Arguments and Conduct of Counsel. Undue influence of passion and prejudice of the jury cannot be based upon improper remarks of counsel in argument to the effect that he had a witness "cornered" at the time of adjournment taken, where no notice was taken of it at the time, and it was left unchallenged.

· Trial (51)—Argument of Counsel—Objections and Exceptions. Error cannot be assigned upon improper argument of counsel unless objected to and the court is requested to correct it, where it was capable of cure by instruction.

Contracts (149)—Performance—Excuses for Non-performance. A contractor is not justified in deviating from the plans and specifications by reason of a conflict with scale drawings, where a casual examination would have disclosed the proper course.

Same (139)—Performance—Acceptance or Approval of Work. An architect's acceptance of a building and final payment is not conclusive on the owners where they were ignorant of the contractor's failure to follow the plans and specifications of the contract, which provided that, regardless thereof, the contractor must make good any defects discovered within six months after acceptance.

Appeal (456)—Review—Harmless Error—Error Cured by Withdrawal. The improper admission of evidence upon one element of damages is not ground for reversal where that part of plaintiff's claim was withdrawn from the consideration of the jury.

Trial (118½)—Deliberations of Jury—Taking Exhibits to Jury Room. The accidental sending to the jury room of an exhibit that

[1] Reported in 236 Pac. 290.

has been excluded is not prejudicial, where it appears from the affidavits of jurors that it was not examined by the jury until after the verdict was agreed upon.

EVIDENCE (207½)—OPINION EVIDENCE—COMPETENCY OF EXPERTS. A piano tuner of twenty years' experience who has been in the retail trade for fifteen years and was familiar with the prices of pianos in the locality, is competent to testify as an expert as to the damages from water to the strings, pads and sounding board of a new instrument.

SAME (181-1)—BUILDING CONTRACTS—ACTION FOR BREACH—INSTRUCTIONS. Where it was admitted that a building contract was not performed in respect to the construction of the roof, for which the contractor would be liable, it is not error to instruct to that effect.

DAMAGES (118)—BREACH OF CONTRACT—LOSS OF PROFITS—EVIDENCE. In an action for breach of a building contract, there can be no recovery for loss of profits during the period of loss of use of the building, where the amount was not shown with reasonable degree of accuracy, clear and free from speculation and conjecture.

Cross-appeals from a judgment of the superior court for King county, Gilliam, J., entered March 3, 1924, upon the verdict of a jury rendered in favor of the plaintiffs, in an action on contract. Affirmed.

*Tucker, Hyland & Elvidge* and *Mary H. Alvord,* for appellants.

*Thomas J. Casey* and *Paul S. Dubuar,* for respondents.

FULLERTON, J.—On April 5, 1922, J. H. DeHoney and wife entered into a contract with Peder P. Gjarde, by the terms of which Gjarde agreed to erect for the DeHoneys a building on a described tract of land, in the city of Seattle, to be used as a dancing academy. The contract provided that Gjarde should furnish all the necessary labor and materials and erect the building according to plans and specifications agreed upon between the parties, prepared by one Svarz as architect. The contract price was $27,329, and the building

was to be completed on or before 110 days from the date of the contract. Gjarde entered at once upon the performance of the work, completed it within the time fixed by the contract, and was paid the contract price.

DeHoney and wife took possession of the building sometime in August, 1923, and began to use it for the purposes for which it was constructed. The building gave no trouble during the dry weather which followed the time possession was taken, but in the latter part of October, when the rainy season began, water came into the hall of the building used for dancing in considerable quantities; so considerable, in fact, as to damage the furnishings and to cause the dancing floor to swell and buckle. The DeHoneys conceived that the water came into the room because of a defective and leaking roof, and called upon Gjarde to repair it. Some correspondence passed between them, resulting in a denial on the part of Gjarde of liability. The DeHoneys caused the roof to be repaired by another person, and caused some additional ventilation to be installed in the building, whereupon water ceased to come into the room, and the walls thereof became dry soon thereafter.

The DeHoneys, as plaintiffs, thereafter began the present action to recover against Gjarde and his bondsman, the Fidelity and Deposit Company of Maryland, in damages for the injuries caused by the water. They alleged that Gjarde failed to construct the building in accordance with the plans and specifications, in that he "negligently and carelessly failed to turn up the felt and flashings onto the walls of said building not less than 18 inches as the contract and good workmanship required, but instead turned the same up not to exceed 12 inches in any place, and around the greater portion of the walls, not to exceed four inches, and negligently and carelessly failed to put the same up

tight against said walls or to nail or otherwise fasten or cement the same at sufficiently close intervals, so that as a result the upper portions of the same were allowed to be loose and to bulge out from said walls, so that water could go through where the same should have been fastened tight to the walls and from thence go down under the roofing and thence into the building; that where there were columns erected just inside said side walls, making numerous angles, the said felt and flashings were in some places pressed in so hard by them as to have cracked and broken the same, leaving openings for the water to go through, while in other places, they negligently and carelessly failed to press the same into the angles sufficiently, but on the contrary allowed the same to be loose and to bulge out at the top where it should have been tightly joined to the wall, so that the water could run down into the building as hereinbefore mentioned; that they negligently and carelessly allowed approximately 100 holes and openings to be and remain where the water could leak through, said holes and openings, for the most part being located where said felt and flashings should have been joined tight to the wall and columns, and where the same had been broken as hereinbefore mentioned, which were thereupon hidden by them by placing the counter flashings so as to conceal the same; that the top of said counter flashings was fastened by them to a wooden strip set in the concrete wall; that they negligently placed around said wooden strip certain plaster which was made out of poor material in that there was too much sand in the same, so that the same was so porous that it allowed the water to run through the same and back of said counter flashings and that much of said plastering material fell out after the same became water soaked; that the felt and flashings around the ventilators were not properly fastened

by them, as hereinbefore stated, so that the same were loose and bulged at the top, allowing the water to leak in; that the paper used by them on the slopes where the roof slopes steeply from the upper portion of the roof to the 'valley' portion of the roof below, was of poor quality, in that the same was checked and cracked; that the paper used by them on the roof and slopes was so put together by them that the same would leak at the joints and seams, the cause thereof not being known to plaintiffs; that along the south side of said building there were leaks under the windows; that they wholly failed to place any galvanized iron boxes in the corners, surrounding the drain pipes, but instead placed boxes made of cheap tin, none of which were securely soldered, so that the water leaked out of them, instead of going into the pipes; that no screens were placed in said boxes until after the first rains hereinafter mentioned, and on approximately the 17th day of November, 1923, thus allowing said pipes to become clogged; that by reason of the matters hereinabove set forth, said building, when turned over to the plaintiffs on or about Aug. 29, 1922, did not have a roof capable of turning water during an ordinary rain, but on the contrary said roof was in such condition as to be leaky in wet weather, none of which defects were discovered by plaintiffs or known to them until the rains hereinafter mentioned occurred.''

Damages were claimed in the following sums for the following items:

| | |
|---|---|
| Repairing roof | $541.35 |
| Carpenter work | 400.30 |
| Redecorating the walls and work on damaged paintings | 403.65 |
| Plumbing work | 25.47 |
| Tinning | 5.25 |
| Resurfacing the dancing floor | 600.00 |

Redecorating the walls and ceiling.......... 1,500.00
Additional work on paintings..............  600.00
Damage to seats.........................  800.00
Damage to piano........................:.....  500.00
Damage to curtains......................  300.00
Depreciation of building (Not repairable)...10,000.00
Loss of profits because of non-usability of
    building ............................25,000.00

The first five of the items of damage were for money actually expended for the work therein indicated. Other items, in so far as they relate to work, were the estimates of witnesses of the reasonable cost of performance. The remaining items are self-explanatory. After issue had been joined on the complaint, a trial was entered upon before a jury. During the course of the trial the court withdrew from the consideration of the jury the item of damage relating to loss of profits. The jury, on the remaining items, returned a general verdict for the plaintiffs in the sum of $14,500.25. Within due time, the defendants moved for judgment notwithstanding the verdict, or, in the alternative, for a new trial. The court denied the motion for judgment notwithstanding the verdict, but entered an order to the effect that it would grant the motion for a new trial unless within twenty days thereafter the plaintiffs would in writing remit from the amount of the verdict the sum of $10,000; further ordering that, in case such remission be made, the plaintiffs have judgment for the amount of the remainder of the verdict. The remission was filed within the required time, and thereupon judgment was entered in favor of the plaintiffs for the sum of $4,500.25.

The plaintiffs also moved for a new trial on the question of damages for loss of profits, which motion the court denied. Both parties appeal; the defendants

from the judgment entered, and the plaintiffs from the order of the court refusing them a new trial on the question of the loss of profits.

Taking up the appeal of the defendants, they first assign error on the ruling of the court denying them a new trial. Under this head they present a number of questions, the first being that the verdict was the result of passion and prejudice on the part of the jury. It is said that this is evidenced (1) by the amount of the verdict, (2) because the verdict is contrary to the evidence, and (3) because the trial court so found. Noticing these in their order, of the first it can be said that the verdict was well within the testimony introduced on the part of the plaintiffs. The total sum claimed by the plaintiffs, and which their evidence tended to prove, omitting the claim of $25,000 for loss of profits which the court took from the jury, was $15,676.02. The general verdict of the jury was for $14,500.25. Manifestly, it seems to us this is not so close an approximation to the plaintiffs' claims as to furnish conclusive proofs that the jury gave the evidence no consideration, but followed blindly the plaintiffs' testimony.

Nor did the question of the amount of damages suffered rest upon the testimony of the plaintiffs alone. They were supported by competent disinterested witnesses, some of whom had made estimates with a view of repairing the damages. Nor was the item of depreciation without evidence in its support. In addition to the estimates, a witness who had been engaged in building construction for twenty-three years testified that in his judgment the building was depreciated in value by the flooding to which it had been subjected in the sum of $10,000. The amount of the depreciation is, of course, of no moment on the present appeal, since the plaintiffs consented to waive their claim

thereto rather than submit to a new trial. It is mentioned to repel the inference which might otherwise be thought to obtain, that the jury returned a verdict for a claim unsupported by evidence. True, there are affidavits of certain jurors to the effect that some of the items of damage were allowed in full and others disallowed, but conceding that jurors may thus explain their verdict after their discharge, there is nothing in the fact which so far impeaches it as to require the court to say that it was the result of passion and prejudice. Moreover, we do not find in the record that the estimates of the plaintiffs' witnesses were disputed by the other side. There was a leakage from the roof at one time for which the defendants admitted fault, and they offered testimony to the effect that the damage caused thereby did not exceed $50, but on the general question of the amount of damages, the cause went to the jury on the testimony of the plaintiffs' witnesses. It would seem that, under these circumstances, the court could hardly find either passion or prejudice had the verdict been for the full amount demanded.

The second contention under this head is that the overwhelming weight of the evidence relating to the cause of the damage is against the verdict of the jury. It is first argued that the building was constructed according to the plans and specifications, and if it was so constructed as not to furnish protection against leaks in the roof, it was the fault of the plaintiffs who furnished the plans and specifications, and not the fault of the builder. To an understanding of this argument some notice must be taken of the plans and specifications. The building was in size 72 feet by 128 feet. It was a one-story building with the ceiling 18 feet above the floor. The walls were of six-inch reinforced concrete. The roof was for the greater part comparatively flat, breaking down at rather a sharp

angle as the walls were approached, forming a valley or gutter along the walls. The frame work was of wood construction covered over with sheathing boards. Over the sheathing boards was laid a dry sheet of felt, and over this four layers of felt glued together with roofing cement. On top of this was poured a coating of asphalt onto which gravel was spread. The construction of the slopes was the same as the main part of the roof, except that the gravel was omitted and in its stead was placed an additional thickness of 3-ply Lastile roofing, called a finishing sheet. The plans required the felt to reach across the valley formed by the junction of the roof and the wall, and to extend up the wall for a distance of 18 inches. This extension is called in the record the base-flashing. It was to be well pressed into angles of the wall, reinforced with a strip of felt eight inches wide, cemented solidly in place, and covered by a counter-flashing—a strip of galvanized iron fastened into the wall and bent over the base-flashing. The counter-flashing was fastened to a reglet placed in the wall at the time the concrete was poured. The valleys or gutters were constructed with a slope or pitch towards the corners of the building wherein were placed outlet boxes with pipes leading to the city sewers, furnishing an escape for water falling on the roof.

By some miscalculation the reglets were not placed high enough in the walls of the building to permit the base-flashing to extend up the walls for the distance called for by the plans and specifications—the actual distance, instead of being eighteen inches as the plans required, was twelve inches at the highest place, ranging from that distance down to four inches at the lowest. It was the testimony of plaintiffs and their witnesses that the base-flashings were not cemented to the wall and that water falling on the roof and flowing

into the valley would rise higher than the base-flashing, pass under the counter-flashing and flow down between the base-flashing and the wall of the building and come out into the main dancing hall. The evidence on the part of the defendants, on the other hand, was to the effect that there was no leaking in this manner, that the water that was found in the dancing room was the result of condensation, caused by the crowds that gathered in the room and insufficient ventilation. The evidence on these discordant views it would serve no useful purpose to review. As we read the record, the evidence preponderates on the side of the plaintiffs. At the least, there was substantial evidence supporting the view of the plaintiffs sufficient to warrant the jury in so finding without subjecting them to the charge of being controlled by the undue influence of passion and prejudice.

The third ground assigned for the conclusion that the jury were influenced by passion and prejudice in rendering their verdict, we think, is also without foundation. The matter arose out of the argument of one of the plaintiffs' counsel to the jury. It appears in the record by affidavits filed by the defendants in support of their motion for a new trial, and opposing affidavits by the other side, no stenographic report of the argument being taken. In the defendants' affidavits counsel for the plaintiffs is accused of stating to the jury that the court in its rulings and conduct unduly favored the defendants; the more precise charge being that counsel stated to the jury that in his cross examination of one of the defendants' witnesses he had the witness "cornered," and that the court came to his relief by calling a recess, giving the witness an opportunity to collect his thoughts. In the opposing affidavits it is admitted that counsel said something in the nature of the remark cited to the jury, but

he denies that his language was capable of the interpretation put upon it by the defendants, that he expressly disclaimed at the time that he was charging the court with unfairness, and stated expressly that the recess was called because the usual time therefor had arrived. · In passing upon the motion for a new trial, the court stated that he thought the remark was very unfortunate, and that it "must have had some effect upon the jury"; further stating that ordinarily remarks of this sort "react on the person making the remark, but it is evident in this case it did not, in view of the verdict that was returned."

It is from these statements of the court that the defendants draw the conclusion that the court found that the jury's verdict was the result of passion and prejudice. But we cannot draw therefrom a like conclusion. The court's very ruling on the motion is conclusive to the contrary. The trial judge is distinguished and experienced. He has long presided on the trial bench, and it is unthinkable that his sense of justice would permit him to let the verdict stand if he was of the belief that it was founded on something other than the evidence in the cause. It is our feeling that much is here made of little. At the time of the argument, the remark was not regarded as of sufficient moment to require notice either by the trial judge or by the opposing counsel. Manifestly, if it was then thought that it contained the sinister charge now imputed to it, it would not have gone unchallenged.

It is further argued in this connection that the remarks imputed to counsel require a reversal in any event, regardless of the question of passion or prejudice. But we think we need not pursue the inquiry further than to add that in this aspect it is not sufficiently before the court for review. No objection to the remark was made at the time of its utterance. The

rule is that improper argument of counsel cannot be successfully assigned as error unless there has been a request to the court to correct it by instructing the jury to disregard it, or unless the misconduct is so flagrant as to be incapable of cure by instruction. *Canfield v. Seattle Cornice Works*, 122 Wash. 318, 210 Pac. 773; *Vanderveer v. Hillman*, 122 Wash. 684, 211 Pac. 722. In our view, there was nothing in the remark here incapable of cure by instructions.

The next contention is that, if the damage to the building was the fault of a leaking roof, it was due to defects in the design of the building and not due to the fault of the contractor. To an understanding of the objection, some further description of the manner in which the roof was constructed is necessary. Where the roof supports joined the wall of the building, a valley was left by the mode of construction required of some eight or nine inches wide only. The plans required a galvanized iron drain box twelve inches wide to be inserted in the valley to facilitate the flow of water to the outlet pipes located at the corners of the building, and further required that the drain should have a slope. A drain box twelve inches wide would not thus rest on the top of the supporting beams, or closer thereto than some four or more inches. In making the measurements for the insertion in the wall of the reglets at the time of its construction, no allowance was made either for this elevation or for the slope of the box, and apparently there were other things which raised the bottom of the valley for which no allowance was made. As the position of the reglets measured the height of the base-flashings, the result was that the flashings did not extend eighteen inches above the bottom of the valley.

It is claimed that the scale drawings of the architect showing the position in the wall at which the reglets

were to be inserted made no allowance for these differences, and that there was thus a conflict between the plans and specifications and the scale drawings, and that the builder was justified in following the scale drawings. It is further contended that the architect, who was empowered by the building contract to reconcile conflicts that might exist between the plans, specifications and drawings, had his attention called to this discrepancy at the time it was discovered, and that he not only approved the work at that time, but also subsequently accepted the completed work as a compliance with the contract. But we cannot accept these conclusions. As we view the drawings, it required some rather delicate measurements to determine the position of the reglets in the wall from the drawings alone, and that error could easily occur by relying upon such measurements. But the rule is that plans, specifications and drawings for a building must be construed as a whole, and plainly, nothing more than a casual examination of the whole would at once disclose that measurements from the top of the roof beams would not permit the insertion of the base-flashings to the height required by the plans and specifications. Nor do we think that the approval of the architect bound the owners. At the time of the acceptance and final payment, they were ignorant of this failure to follow the plans and specifications, and we find this clause in the contract:

"No payments or certificate, final or otherwise, shall be construed to relieve the contractor from his obligation to make good any defects arising or discovered in his work within six months after the completion and acceptance of the same."

The discovery of the defect was made within the six months' period, and within that time a demand was

made upon the builder to repair it, with which demand there was no compliance.

The specifications provided:

"The roofing contractor shall give a satisfactory written guarantee on the roof, guaranteeing same for the period of ten years against leaks, and keeping the same in repair during the ten years."

As a compliance with this clause of the specifications the builder procured a letter from the corporation to whom he had let a subcontract for installing the roof, in which the subcontractor agreed to maintain the roofing installed by them for a period of ten years. The recited conditions were:

"This agreement relates only to the material and workmanship furnished by us, and will be fulfilled by repairing free of charge any leaks resulting from defects in such material or workmanship. This maintenance agreement is issued to Peder P. Gjarde of Seattle, Wash., and refers to approximately 106½ squares of roofing completed on the 5th day of June, 1922, on a building located on Lot 12 and south 20 feet of Lot 11, Block 11, Nagles Addition to the City of Seattle, known as the DeHoney Dancing Academy building."

This letter was forwarded to the plaintiffs and retained by them. The defendants requested the court to charge the jury that the "letter constituted a sufficient and satisfactory guarantee and complied with the terms of the specifications," and that "the liability of the defendants in this case is limited to the fair and reasonable costs in putting the roof in satisfactory condition, if you find that it was leaky or defective, . . . and you cannot award" the plaintiffs "damages for any injuries to their building, its floors, walls or contents." The court declined to give the instruction and error is assigned thereon. Were this an action based upon the special warranty set forth, possibly the rule for which the defendants contend might

be applicable. But this is not such an action. It is an action based upon the building contract as an entirety, of which this warranty is only a part. The question is not, therefore, was there a breach of the warranty, but is rather, was there a breach of the building contract. In such an action the measure of damages is the amount of damages which naturally result or flow from the breach complained of, and which were contemplated by the parties as a probable consequence of the breach. *School District No. 172 v. Josenhans,* 88 Wash. 624, 153 Pac. 326. There can, we think, be no question that a breach of that part of the contract relating to the construction of the roof, if the breach was of such a nature as to cause it to leak water in quantities such as was shown here, would materially damage the interior of the building as well as the contents of the building. There can, therefore, be a recovery of the damages ensuing from the breach, regardless of the terms of the special contract to keep the roof in repair.

The sixth assignment of error relates to the evidence introduced to show a loss of profits. It will be remembered that the court, during the course of the trial, withdrew this item of damage from the consideration of the jury and instructed the jury not to consider the evidence relating thereto. At this stage of the proceedings the plaintiffs had introduced a considerable part of their evidence on the subject, and it is contended that, notwithstanding the withdrawal of the item from the consideration of the jury and the instruction given, the prejudicial effect of the evidence was not thereby cured. But we see nothing unusual in this circumstance. In the trial of causes it frequently happens that the court must, from the nature of the case, admit evidence on subjects which he must afterwards withdraw from the consideration of the

jury, and if this must in every case require the trial
court to discharge the jury then empaneled and com-
mence over again, "there will," as we said in *Bayers
v. Barry,* 114 Wash. 252, 194 Pac. 993, "be no end to
law suits." But the rule is not thus stringent. In the
early case of *Lyts v. Keevey,* 5 Wash. 606, 32 Pac. 534,
we said we were not disposed to adopt the rule that
evidence improperly admitted cannot be counteracted
in the subsequent course of the trial by instructions
withdrawing its consideration from the jury. This
rule we have followed in many subsequent cases. See:
*Wilson v. West & Slade Mill Co.,* 28 Wash. 312, 68 Pac.
716; *Yakima Valley Bank v. McAllister,* 37 Wash. 566,
79 Pac. 1119, 107 Am. St. 823, 1 L. R. A. (N. S.) 1075;
*Billings v. Snohomish,* 51 Wash. 135, 98 Pac. 107; and
the cases collected in the cited cases.

In *State v. Gay,* 82 Wash. 423, 144 Pac. 711, concern-
ing this question, we said:

"But it is contended that the evidence was so far
prejudicial as to be incapable of cure by its with-
drawal from the consideration of the jury. To this
point, the appellant cites *State v. Pryor,* 67 Wash. 216,
121 Pac. 56. That case, however, was an extreme case.
The evidence admitted and subsequently withdrawn
had reference to offenses degrading in their nature, in
no way connected with the offense upon which the ap-
pellant was being prosecuted, and was withdrawn only
on condition that the defendant would admit a fact
necessary to be shown in order to convict him of the
offense with which he was charged. Under these cir-
cumstances, the court could well conclude that the act
of the court did not remove the prejudice occasioned
by the admission of the improper evidence. But it was
not therein intended to be held that no error in the
admission of improper testimony can be cured by such
means, and especially was it not meant to be held that
evidence, not objectionable in itself, but improperly
admitted because of a circumstance not shown when
the testimony was offered, cannot be cured by with-

drawing it from the consideration of the jury. The presumption in all cases is that the jury obeyed the instructions of the court, and this presumption must prevail until it is overcome by some showing that the fact is otherwise. To withdraw evidence subsequently discovered to be improperly admitted is a common practice in criminal as well as in civil causes, and the procedure is generally held to cure any error caused by its improper admission. *State v. Manville,* 8 Wash. 523, 36 Pac. 470; *Yakima Valley Bank v. McAllister,* 37 Wash. 566, 79 Pac. 1119, 107 Am. St. 823, 1 L. R. A. (N. S.) 1075. We think in the present case any error committed by the admission of the testimony objected to was cured by its subsequent withdrawal."

This court has held, it is true, in cases other than the case referred to in the last cited case, that there are circumstances where the prejudicial effect of improper evidence is not removed by instructions to disregard it, but it will be found from an examination of the cases that they present circumstances differentiating them from the general rule, matters not present in the case now before us.

The account book of the plaintiffs showing their receipts and disbursements in the operation of the building prior to and during the time the leakage from the roof occurred, was admitted in evidence as tending to prove loss of profits. When this item of damage was withdrawn from the jury the book as evidence was also stricken. By some inadvertence, however, it was sent to the jury room along with the exhibits in the cause. The affidavits of the jurors submitted show that the book was not examined by the jurors until after they had agreed upon a verdict, when some member of the jury read certain items therefrom. As the book related to matters which the court had instructed them were not for their consideration, it is difficult to see wherein it could have a prejudicial effect even had it been examined by the jury. But conceding that

prejudice under that circumstance might be presumed, the fact shown precludes error. The rule is thus stated in Thompson on Trials, § 2590:

"If the paper was taken out by mistake, and not by the fraud or design of the prevailing party, or his counsel, and if it was not in fact read by the jury, then there is no occasion to grant a new trial; since no harm has been done to the party against whom the verdict was rendered, and the other party has done no wrong for which he is to be punished. And the rule is the same where it is made to appear that the only jurors who read the objectionable paper had already agreed to return the verdict which was rendered. As the affidavits of jurors are generally admissible to sustain their verdicts, it may be shown by such evidence that the paper was not in fact read by any of the jury."

Here the book went to the jury by mistake, and not by fraud or design of the prevailing parties or their counsel. Nor was it considered by the jury. Hence, in the language of the authority cited, "no harm has been done to the party against whom the verdict was rendered."

The plaintiffs' witness Kubat was permitted, over the objection of the defendants, to testify to the damage to a piano in the building caused by moisture. The objection was based on the ground that he had not shown sufficient qualifications. From his testimony it appears that he had had twenty years' experience as a piano tuner, that he had been in the wholesale and retail trade of pianos for fifteen years, that he was familiar with prices of pianos in Seattle, and had done much work on the piano in question. At the time he was testifying he could not recall the make of the piano, but testified that it was a baby grand, a brand new instrument, and that the damage was to the strings, the pads, and the sounding board; the latter injury causing the principal damage. In our opinion,

he was qualified to testify. The weight to be given to his testimony was, of course, for the jury, but its admission neither requires a reversal nor the deduction of this item of damage from the amount of the verdict.

Certain witnesses were called by the plaintiffs on rebuttal, and it is objected that their testimony is not proper rebuttal. These objections we shall not notice in detail, as we can see no such prejudice as would require a reversal, even were the objections well taken. But, more than this, we cannot conclude that the objections are well taken.

The remaining assignments relate to the instructions of the court to the jury. There were requests for instructions which the trial court refused to give, and there were instructions to which the defendants excepted. In the main, they involve the question of the proper construction of the contract. These in part we have hereinbefore adverted, in which we have declined to follow the construction of the defendants, and have followed that of the trial court. These require no further discussion. Those not heretofore involved will be briefly noticed. The defendants requested the following instruction:

"I instruct you that by the express terms of the contract in evidence in this case, the architect, Louis Svarz, was the agent of the owner, J. H. DeHoney, and as such had authority to represent and bind the owner by all of his directions and orders to the defendant Gjarde."

The court, on the subject-matter, gave the following:

"I instruct you that by the express terms of the contract in evidence in this case, the architect, Louis Svarz, was the agent of the owner, J. H. DeHoney, and as such had authority to represent and bind the owner by all of his directions and orders to the defendant Gjarde, in so far as the quality of the materials·and

workmanship were concerned, but not as to any material deviation from the plans and specifications.

"You are instructed that it is provided in said contract and specifications that no alterations shall be made in the work shown or described by drawings and specifications, except upon the written order of the architect; that no deviation from the drawings or specifications shall be made in the execution of the work without the written approval of the architect; that no verbal statement of any person whomsoever shall be allowed in any manner or degree to modify or otherwise affect the terms of the contract of specifications, and that changes shall be made only and strictly according to contract."

In its instructions the court but followed the provisions of the contract. There was elsewhere in the contract, it is true, recitals to the effect that the architect was the agent of the owner, and that his interpretation of the contract should be final, but these provisions referred to instances of repugnant provisions of the contract, or to instances where the contract did not speak; it gave the architect no power to modify provisions capable of but one interpretation. As we said in *Dyer v. Middle Kittitas Irr. Dist.*, 40 Wash. 238, 82 Pac. 301:

"The contract provides that the engineer shall define the meaning, intent, and purport of the plans and specifications, and that his decision in all cases shall be final; but this, it is plain, refers to the interpretation of doubtful and uncertain terms of the contract, not to the question of law presented by the language of the contract or specifications. This clause does not confer upon the engineer the power to vary the meaning of plain terms used in the contract, for if this were so, there would be no need of the writing, as the engineer's arbitrary assertion would be all-sufficient."

See, also: *Hurley v. Kiona-Benton School Dist., No. 27*, 124 Wash. 537, 215 Pac. 21; *Mercantile Trust Co. v. Hensey*, 205 U. S. 298.

The trial court further on in its instructions quoted certain of the provisions of the contract relating to the manner of constructing the roof, and instructed the jury that even though they should find that the defendant Gjarde had the roofing work done by a subcontractor, he would nevertheless be under obligation to see that there was no deviation from the contract. The defendant objects to this for the reason that it amounted to an instruction that the defendant was obligated "to see that the base flashing was turned up 18 inches, which was the pivot of the whole case." In our opinion, the instruction was correct, even though it be so construed. As we have before indicated, the fact being admitted that there was not a compliance with the contract with reference to the construction of the roof in the respect stated, it followed as matter of law that there was a breach of the contract, for which the defendant was liable in damages for the injury that arose from the breach. Error, therefore, cannot be predicated on an instruction so stating.

Turning to the plaintiffs' appeal, we find no error in the ruling of the court withdrawing from the consideration of the jury the question of loss of profits. True, this court is committed to the rule that loss of profits may be recovered, but we have said that the loss must be shown with a reasonable degree of accuracy, and that the testimony establishing the loss must be clear and free from taint of speculation or conjecture. *Kohne v. White,* 12 Wash. 199, 40 Pac. 794; *Purcell v. Warburton,* 70 Wash. 129, 126 Pac. 89; *Matzger v. Arcade Building & Realty Co.,* 102 Wash. 423, 172 Pac. 47; *Brinnon Logging Co. v. Carlsborg M. & T. Co.,* 122 Wash. 483, 210 Pac. 945; *Schermerhorn v. Sayles,* 123 Wash. 139, 212 Pac. 156.

The cases cited and the cases referred to in the citations illustrate the rule as we have applied it, and

the principle involved requires no further elucidation. The evidence introduced shows that any verdict rendered thereon must, as to its amount, be speculative and conjectural, and we conclude that it was properly withdrawn from the consideration of the jury.

Our conclusion is that the judgment must be affirmed on both appeals, and it is so ordered. Neither appellant will recover costs in this court.

HOLCOMB, MAIN, MITCHELL, and MACKINTOSH, JJ., concur.