[No. 37739.   Department One.   February 3, 1966.]

VALLEY CONSTRUCTION Co., *et al., Respondents,* v. LAKE HILLS SEWER DISTRICT, *Appellant.**

*Reported in 410 P.2d 796.

*Evan E. Inslee* (of *Johnson, Jonson & Inslee*), for appellant.

*Allen, DeGarmo & Leedy,* by *Gerald DeGarmo,* for respondent.

LANGENBACH, J.†—Respondents, as contractor, sued to recover the unpaid balance on a contract and to recover costs for repairs which were requested by appellant. Appellant affirmatively counterclaimed for damages which allegedly resulted from respondents' failure to follow contract specifications, but admitted a balance was still due on the contract.

The trial court granted judgment for respondents as pleaded, and dismissed the counterclaim with prejudice. This appeal was perfected.

Respondents contracted to construct an 18-inch trunk sewer and two syphon lines according to contract specifications. The trunk sewer was satisfactorily completed; this dispute concerned only the installation of the syphon lines.

The syphon lines consisted of two pipes, one 10 inches and the other 12 inches, inside diameter, to be laid beside each other in a single trench for a distance of 4,100 feet with a minimum of 6 inches between them, and with the maximum trench width (at pipe level) of 16 inches plus the outside diameter of the pipe. The 12-inch pipe was to be laid 7 feet from the edge of a road, under a drainage ditch, with a minimum 36-inch cover. The lines were to follow the grade of the road.

The contract required the respondents to perform trench excavation and backfill, furnish and install pipe, manholes,

†Judge Langenbach is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

fittings and other appliances. The respondents used 13-foot sections of asbestos cement pressure pipe as the syphon lines.

The applicable pipe bedding method was prescribed as follows:

10. *Pipe Bedding*

Pipe bedding shall be accomplished as shown in the Standard Detail. Where the material at the bottom of the trench is unstable, the matter shall be brought to the attention of the Engineer. The unstable material shall be removed to the extent directed by the Engineer and backfilled with foundation gravel, bedding gravel, and/or bedding concrete.

Boulders, rocks, roots and other obstructions shall be entirely removed or cut out to the full width of the trench and to a depth 6″ below the pipe. The trench shall be backfilled and compacted to grade with select materials from the excavation or with bedding gravel.

In solid rock the trench shall be excavated 6″ below the pipe bottom and backfilled as provided above.

The bottom of the trench shall be finished with hand tools to provide uniform bearing along the barrel of the pipe and to provide suitable holes to fit the pipe bells.

Whenever the trench is excavated below the depth required for proper bedding, it shall be backfilled with bedding gravel and compacted as required by the Engineer.

The evidence disclosed that, as the syphon line trench was being excavated, hardpan was encountered. The contract stated respondents had inspected the area and were satisfied as to the conditions of the site and contract specifications prior to submitting a bid. The contract specified that respondents handshape the trench bottom to fit the pipe barrel so that the pipe would rest on the shaped trench bottom. Respondents admitted this, but asserted that, when the hardpan was reached, it became impossible to handshape the bottom of the trench.

This hardpan condition was orally called to the attention of appellant's inspector, chief inspector, and project engineer, in an attempt to secure permission to use bedding

material (pea gravel) in preparation of the trench bottom. Inspector Sims approved and reported favorably to his superiors, who refused this permission. Such requests were verbal, and none were in writing, as required by the contract:

7. *Corrections, Interpretations and Addenda*

Any omissions, discrepancies or need for interpretations should be brought to the attention of the Engineer in writing. The Engineer will issue written addenda to clarify questions which may arise. All interpretations or explanation of the Contract Documents shall be in writing in the form of an addendum and no oral statements by the Owner, Engineer or other representatives of the Owner shall in any way modify the Contract Documents whether made before or after letting the Contract.

9. *Omissions and Discrepancies:*

. . . .

If the Contractor, in the course of the work, finds any discrepancy between the drawings and the physical conditions of the locality, or any errors or omissions in drawings or in the layout as given by points and instructions, it shall be his duty to inform the Engineer immediately in writing, and the Engineer shall promptly verify the same. Any work done after such discovery, until authorized, will be done at the Contractor's risk.

The contract provision for payment of bedding material was:

Item No. 15

Unit price includes furnishing, placing and compacting bedding and foundation gravel and pit run gravel backfill material other than materials available from trenching. Payment will be made for only such material as is ordered by the Engineer. Bedding or foundation material required by unauthorized excavation below the required trench depth or for special bedding for Class 3 clay pipe shown on the plans will not be paid for.

. . . .

Furnish & Install Bedding Gravel 500 CY $4.50 $2250.00.

When these oral requests for use of bedding material in the hardpan trench were refused, respondents determined that handshaping the trench bottom for suitable support of

the trench barrel was impracticable in all instances and impossible in hardpan. Consequently, a cushion course method of installation was utilized. From the excavation, selected material (excluding rocks, roots and foreign material) was used for a cushion course of approximately 4 inches in depth. This was compacted by men walking on it. Thereon mounds would be placed; one where each end of the pipe was to be laid. Due to over-excavation, the mounds in some instances were 12 inches high; normally, the mounds were approximately 4 inches high. These mounds would not be compacted nor tamped prior to laying the pipes. After the pipes were laid, select material was used to fill the ditch up to the middle portion of the pipes; then, the dirt was compacted by two-by-fours, handles of shovels, and men using their feet. Due to the narrowness of the trench, this compacting was difficult.

The material used for mounding and filling was relatively dry. When the rains fell, the mound and fill material (the pipes being laid under a drainage ditch) became so saturated that it turned into a mush substance. Accordingly, the pipes were allowed to change position to such an extent that they broke. The engineers testified that the breaks were caused by "beam action." The plane of separation was nearly perpendicular to the center line of the pipe. This type of crack indicated that the top of the pipe had been in tension and the bottom in compression; the ends of the pipe sections deflected downward relative to the middle of the pipe. The number of the breaks totaled 48.

After these breaks, appellant demanded that respondents make repairs and replace 1,000 feet of pipeline. Respondents made repairs but refused to replace the 1,000 feet of pipe; thereupon appellant retained another contractor. For this extra cost, appellant counterclaimed.

Although appellant made several assignments of error, the critical one is finding of fact No. 4:

That following the execution of said Agreement aforesaid Plaintiffs entered upon the performance thereof on or about March 10, 1959, and proceeded to lay and install said 18″ trunk sewer and syphons in a good and work-

manlike manner and would have completed said Contract work in its entirety on October 22, 1959, to which said date the time for performance was extended by Defendant, save for conditions and circumstances beyond their control in that due to the nature of the soil in which the syphon lines were to be laid, the fact that said trench for the syphon lines generally was underneath the drainage ditch for the roadway adjoining and that the design of said syphon line installation called for both the 10″ and 12″ 150 foot head asbestos cement pressure pipe 13 feet in length to be laid in the same trench at the same elevation with a minimum 6″ clearance between the two and with a maximum trench width at the top of the pipe as the outside diameter of the pipe barrel plus 16″ *it was not possible by the exercise of good workmanship and without the use of bedding gravel, as requested by Plaintiff of Defendant and the use of which as a pay item under said Contract was refused by Defendant, to obtain compaction of the material selected from the excavation for the bedding for the pipe so as to provide uniform support or bearing for and along the barrel of the pipe, by reason of all of which when the fall rains came commencing in September of 1959 and the soil in the trench became saturated there occurred approximately 48 leaks in the said syphon lines by beam action which required repair.* (Italics ours.)

The questions are whether this finding is supported by the evidence, and whether, in any event, respondents were relieved of their contract specifications.

The general principles and law are well-settled:

[I]n 88 A.L.R. 798.

" . . . [A] construction contractor who has followed plans and/or specifications furnished by the contractee, his architect or engineer, and which have proved to be defective or insufficient, will not be responsible to the contractee for loss or damage which results—at least after the work is completed—solely from the defective or insufficient plans or specifications, *in the absence of any negligence on the contractor's part,* or any express warranty by him as to their being sufficient or free from defects." (Italics ours.) *Kenney v. Abraham,* 199 Wash. 167, 170, 90 P.2d 713 (1939).

Contractors have no right to depart from working plans made a part of the contract. If they do so, it is at their

peril, and they become guarantors as to the strength and safety of the structures. The parties were clearly entitled to contract to have the buildings erected in accordance with certain plans and specifications. An express contract admits of no departure from its terms, and the subcontractors could discharge themselves from liability only by constructing the buildings in accordance with the plans and specifications, unless a deviation was mutually agreed upon.

. . . .

When defendant departed from this specification they did so at their peril, and all attempted excuses for noncompliance became immaterial. *Robert G. Regan Co. v. Fiocchi,* 44 Ill. App. 2d 336, 340, 194 N.E.2d 665 (1963).

The general rule is that a builder must substantially perform his contract according to its terms, and in the absence of contract governing the matter, he will be excused only by acts of God, impossibility of performance . . . . If he wish to protect himself against the hazards of the soil, the weather, labor or other uncertain contingencies, he must do so by his contract. *White v. Mitchell,* 123 Wash. 630, 634, 213 Pac. 10 (1923).

In *Maryland Cas. Co. v. Seattle,* 9 Wn.2d 666, 676, 116 P.2d 280 (1941), the court noted that the contract in that case did not contain any representation or implied warranty as to underground conditions. It said:

Rather, we think, the present case comes within a familiar principle of contract law which is succinctly stated in the italicized portion of the following quotation from Judge Brandeis' opinion in *United States v. Spearin,* 248 U.S. 132, 136, 63 L. Ed. 166, 39 S. Ct. 59:

*"Where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered* [citing cases]. Thus one who undertakes to erect a structure upon a particular site, assumes ordinarily the risk of subsidence of the soil [citing cases]. But if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications [citing cases]."

Respondents inspected the area prior to bidding and

knew it to be of hardpan; yet, they did not contract for such a possibility. They assumed the risk of the difficulty encountered in handshaping to fit the barrel of the pipe into a hardpan trench. See, Restatement, Contracts § 456; and 6 Corbin, Contracts § 1333, p. 365 (1962). Nevertheless, respondents argued that, upon hitting hardpan, handshaping the trench bottom became so impracticable as to be impossible; that they went to appellant's inspector and engineer for permission to use bedding gravel, which was denied. Also, the consensus of all expert witnesses was that some bedding material (as pea gravel) was required for proper installation of these syphon lines, and that handshaping the trench was not an adequate method under the circumstances. Be that as it may, respondents agreed to follow the specifications provided by appellant; as long as they did so, they would not be liable for any disastrous consequences.

Even assuming that it was physically impossible to handshape the trench bottom, respondents would only be discharged from nonperformance or poor workmanship (due to the impossibility) by following the specifications. The legal effect of impossibility would not relieve respondents from the onus of guaranteeing any method or plan of installation other than in the contract specification as that rule is stated in *Kenney v. Abraham, supra.*

Confronted with the refusal of their oral requests to use bedding material in the trench, respondents had the following courses of procedure: (1) to obtain *written* permission to use bedding gravel when hardpan was encountered; or (2) to attempt to use bedding gravel as an extra. The only other alternative would have been to proceed as directed by the contract. Section 7 provided, "need for interpretations should be brought to the attention of the Engineer in writing. . . . All interpretations . . . shall be in *writing.*" (Italics ours.) Section 9 provided, "If the Contractor, in the course of the work, finds any discrepancy between the drawings and the *physical conditions* of the locality . . . it shall be his duty to inform the Engineer

immediately in *writing,* and the Engineer shall promptly verify the same. Any work done after such discovery, until authorized, will be done at the Contractor's risk." (Italics ours.)

Instead of proceeding by any of these methods, respondents ignored the contract in the presence of hardpan; the cushion course or mounding method was used. Alternatively, assuming the contract specifications did not require handshaping of the trench bottom, respondents adopted the cushion course or mounding method on their own initiative. In so doing, they assumed full responsibility for their course of action. *Kenney v. Abraham,* 199 Wash. 167, 90 P.2d 713 (1939).

■ Nevertheless, respondents argued that the inspectors and engineer, not only in charge of the project but also in interpreting the contract and in authorizing extras, knew that respondents were using the cushion course method (one inspector described the work as excellent) without any objection thereto. Therefore, appellant is precluded from now objecting. This court, however, in *Hurley v. Kiona-Benton School Dist. No. 27,* 124 Wash. 537, 215 Pac. 21 (1923), has answered this argument. It was held that the clause giving the architect or engineer final power to determine or interpret provisions of a contract does not confer power on the engineer to modify the contract and accept a different specification. Otherwise, there would be no need of the written contract. *Accord, DeHoney v. Gjarde,* 134 Wash. 647, 236 Pac. 290 (1925).

■ Respondents further asserted the trial court's determination and judgment upon conflicting evidence is decisive and the appellate court cannot substitute its findings in lieu of those of the trial court. This court is bound by such findings if supported by substantial evidence. *Delegan v. White,* 59 Wn.2d 510, 368 P.2d 682 (1962).

We are of the considered opinion that the overwhelming evidence on both sides did not support that part of finding of fact No. 4 italicized above. The respondents deliberately did not follow the specifications and contract in the installation of the syphon lines. The breaks were caused solely

and entirely by the manner of their installation. This was the sole responsibility of the respondents, once they determined to ignore the express terms of the contract. This disregard caused the syphon lines to break and the respondents were responsible for such cause.

The judgment is reversed. The cause is remanded to enter a judgment for respondents in the sum of $19,761.08 which the appellant has admitted as the balance due on the original contract. The appellant is allowed its costs on appeal.

HILL, FINLEY, OTT, and HAMILTON, JJ., concur.