[No. 40965. En Banc. April 29, 1971.]
DRAVO CORPORATION, *Respondent and Cross-appellant,* v.
MUNICIPALITY OF METROPOLITAN SEATTLE, *Appellant.*

*Preston, Thorgrimson, Starin, Ellis & Holman,* by *John A. Gose, Gordon G. Conger,* and *Michael B. Crutcher,* for appellant.

*DeGarmo, Leedy, Oles & Morrison, Gerald DeGarmo,* and *Bruce T. Rinker,* for respondent and cross-appellant.

ROSELLINI, J.—In response to an advertisement for bids, published by the Municipality of Metropolitan Seattle, called Metro herein, Dravo Corporation submitted the low bid for the construction of the Enatai interceptor, a sewer pipeline near the East Channel Bridge on the edge of Lake Washington in the city of Bellevue. According to the con-

tract documents, the sewer was to be laid on hardpan where such hardpan existed at the elevation of the sewer. At other points, where the hardpan lay below the elevation of the sewer, which was designed to allow for gravity flow, the pipe was to be supported on piles driven into the hardpan.

Metro had caused test borings to be taken at points along the route of the sewer and had made its drawings according to conclusions which it drew from these tests concerning the contour of the hardpan. Some of the sewer was to be laid underwater and some of it in a peat bog. It was impossible to determine the exact contour of the hardpan lying beneath the sewer in these areas by visual inspection, of course, and the cost of taking sufficient test borings to acquire an accurate picture of this contour would have been prohibitive.

The drawings contained in the contract documents divided the sewer line into segments, which were numbered. The terminal points of each segment were referred to as "stations." They showed that the sewer would be laid on piling from approximately station 20+25 to station 38+00.

However, the invitation to bid advised prospective bidders that they should assume, but only for purposes of computing their bid, that piles would be driven to the depth shown by the drawings. They were advised that if actual conditions at the job site required that the piles be driven deeper, additional compensation would be paid.

The contract also provided in section A2, Information for Bidders:

*A 2.04 Soil Information*

Subsoil investigations, including underwater borings, were carried out in the vicinity of the interceptor sewer alignment prior to the advertisement of the contract. Reports giving the results of these investigations may be examined at the Municipality's offices. These investigations were carried out for design purposes only, and are not considered adequate for construction.

The Municipality does not warrant the correctness of the soil investigations, or of any interpretation, deduction or conclusion given in the report relative to subsurface

conditions. The bidder shall make his own deductions and conclusions as to the nature of the materials to be excavated, the difficulties of making and maintaining the required excavations, the difficulties which may arise from subsurface conditions, and of doing any other work affected by the subsurface conditions, and shall accept full responsibility therefor.

No extra payment will be made over and above the contract price on account of any difference between the information relating to soil and foundation conditions provided by the Municipality and the conditions disclosed at the site of the work during the progress of the contract.

The contract was awarded to Dravo on the basis of its low bid. The work was commenced and progressed to the vicinity of station 38+00. There, as indicated in the drawings, the hardpan began to drop rather sharply and a transition to piling became necessary. This was an area of peat bog. Dravo's subcontractor who was doing this phase of the work drove the piles, in pairs as required by the design, but when Dravo attempted to excavate for the purpose of cutting off the pile tips, capping them, placing a cradle between the two piles in each pair, and laying the sewer pipe thereon, lateral pressure from the surrounding peat caused the piles to tip over.

Metro's representative gave Dravo the option of redriving the piles or pouring a concrete base on which to lay the piles. Dravo chose the latter course.

· From that point on to approximately station 30+00, the pipe was laid on piling in accordance with Metro's drawings. As the operation was carried to that station, it became obvious that the top of the hardpan was rising, since the piling was reaching the required load-bearing capacity at increasingly higher elevations. From about station 30+00 to station 28+86, the elevation to which the piles were driven was above the elevation at which the pipe was to be laid.

Dravo was advised by an agent of Metro that the piles were useless in that area. Nevertheless, the subcontractor

continued to lay the piling across this area, which was 109 feet in length, because it needed them to support its rig. When excavation was begun for laying the pipe, the piles were uprooted. In accordance with the directions of Metro's engineer, the hardpan was excavated to the elevation called for by the drawings and the pipe was laid on a base on the hardpan.

Dravo requested extra compensation for the laying of the pipe at these two locations, but Metro denied that any extra compensation was owed. In this lawsuit which followed, these claims and others as well as certain counterclaims of Metro, were litigated. The trial court found that the conditions at station 38+00 were substantially as represented in the drawings, and that the difficulties which Dravo encountered were caused by its own method of operation. No recovery was allowed for expenses incurred by Dravo at this location.

The court found that the subsurface irregularity which was encountered at station 30+00 to station 28+86 was a condition which was not foreseen by either Dravo or Metro and could not have been foreseen with the information that was available to the parties. It held that Dravo should be compensated for the cost of laying the pipe at this location.

Dravo has appealed from that portion of the judgment which disallowed its claim for compensation for its expenses at station 38+00, and Metro has appealed from that portion which allowed Dravo's claim for compensation for its cost of laying pipe at stations 30+00 to 28+86.

We assume, without deciding, that Dravo is correct when it declares that there was no evidence to support the trial court's finding that its difficulties at station 38+00 were caused by its method of operation. We agree with the parties that the problems at both locations arose because of changes in the contour of the hardpan. The same legal principles apply in both appeals.

This court has subscribed to the generally accepted doctrine governing the allocation of risks involved in excavation contracts, where conditions develop which were not

foreseen by the contractor. In *Maryland Cas. Co. v. Seattle,* 9 Wn.2d 666, 670, 116 P.2d 280 (1941),[1] we stated the rule as follows, quoting from 76 A.L.R. 268 (1932):

"The general rule may be deduced from the decisions that where plans or specifications lead a public contractor reasonably to believe that conditions indicated therein exist, and may be relied upon in making his bid, he will be entitled to compensation for extra work or expense made necessary by conditions being other than as so represented."

In the absence of such representations, we said, the governing rule is that which was stated by Justice Brandeis in the opinion of the United States Supreme Court rendered in *United States v. Spearin,* 248 U.S. 132, 136, 63 L. Ed. 166, 39 S. Ct. 59 (1918), in these words:

Where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered. [Citing cases.] Thus one who undertakes to erect a structure upon a particular site, assumes ordinarily the risk of subsidence of the soil. [Citing cases.] But if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications. [Citing cases.]

We held that a contractor who had agreed to excavate a tunnel and construct a sewer for a fixed sum of money was not entitled to extra compensation because unexpected subsurface soil conditions made it necessary to adopt a more expensive method of excavation.

The facts of the case presently before us show that Metro expressly avoided making any representations concerning the subsurface soil conditions. Both parties agree that the difficulties encountered were due to unexpected conditions of the soil beneath the surface. The risk of incurring added costs by reason of such conditions was expressly placed

---

[1] *See also Valley Constr. Co. v. Lake Hills Sewer Dist.,* 67 Wn.2d 910, 410 P.2d 796 (1966).

upon Dravo, the bidder, under the terms of the written contract.

Dravo suggests that because the drawings showed the sewer laid on pilings in the two areas in question, it impliedly warranted that this method of installing the sewer would be feasible. But we cannot agree that such an implication can arise in the face of the express disclaimer of any representation concerning the subsurface.

It is obvious from the terms of the contract and the facts concerning the site of the work that the difficulty of determining in advance the contour of the hardpan was a matter which both parties had in mind when they contracted. This uncertainty was reflected in the provision for payment for driving piling, where it was made clear that Metro did not know how deep the piles would have to be driven to gain their required load-bearing capacity.

The contract also showed that the pipe was to be laid on solid ground or on pilings, depending upon the elevation of the hardpan. Metro disclaimed any ability to predict in advance what that contour of the hardpan would prove to be. It drew attention to the fact that its conclusions were based upon the tests made by engineers which it had employed. The results of those tests were made available to Dravo and it was invited to draw its own conclusions from them or to conduct its own tests. It was not denied that Dravo was given sufficient time to conduct its own tests had it chosen to do so. It chose not to incur the expense involved in such an investigation, however. Presumably it included in its bid an allowance for added costs which it might be forced to bear if it should encounter unexpected subsurface conditions.

Dravo cites a number of cases involving federal contracts which contain a "changed conditions" clause. Where such a clause is contained in a contract, the owner expressly agrees to adjust the contractor's compensation if unexpected conditions are encountered. The purpose of such clauses is to make it unnecessary for the bidder to take into account, in computing his bid, contingencies of this kind.

This results in lower bids and in lower costs to the owner if the subsurface reveals no unexpected conditions.

Since the contract before us did not contain such a clause, but instead contained a clause placing the risk of such changed or unexpected conditions upon the contractor, the cases cited are not in point.

It also is earnestly urged by Dravo that the difficulties which it encountered were due to faulty design. There are several reasons why this argument is not persuasive. Insofar as station 38+00 is concerned, the trial court found, and the evidence supports this finding, that the conditions at that point were substantially as depicted in Metro's drawings. Transition to piling was indicated at approximately that point. The difficulty in achieving that transition was in nowise attributable to the design of the sewer but rather to the structure of the hardpan, a subsurface condition with which it was Dravo's responsibility to deal.

In regard to station 30+00, it is true that the drawings showed piling at this location. But this does not mean that Dravo was required to use piling if the subsurface conditions indicated that ditching was the proper method to be used in that area. The contrary is true. As soon as the situation became apparent, Dravo was advised that it should substitute the ditching method, a method which was not shown at the trial to be more expensive than the driving, cutting, capping and cradling of piles. Nevertheless Dravo's subcontractor continued to drive the piles. It did this for its own convenience and not at the direction of Metro.

The rule relied upon by Dravo is that if the contractor is *bound* to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications. *United States v. Spearin, supra.*

Here, the contractor was not bound to construct the sewer according to the original drawing but was told to effect a transition to the only feasible method of installing the sewer. Dravo is not charged with responsibility for any

consequences of defective plans or drawings. As far as the evidence shows, the sewer, as it was constructed at these locations, was sound and adequate for its purpose. Any added expense which was incurred because of the transition was due to unexpected subsurface conditions, but not to defective plans or design.

The doctrine relied upon by Dravo is, by its terms, a defensive weapon, not a weapon of offense. Dravo seeks to use it to obtain additional compensation for performing its contract. We are convinced that the doctrine has no application in these circumstances.

The trial court apparently concluded that the expense of laying the pipe at station 30+00 was an "extra" under the terms of the contract. Section B7.03 of the contract provides:

> Extra work means the furnishing of materials and equipment and the doing of work not directly or by implication called for by the contract.

Section A1 declares:

> The work includes the furnishing of all labor, materials and equipment for the construction and completion of the Enatai interceptor sewer, together with necessary connections, structures and appurtenances.

■ Extra work means work done which is not required in the performance of the contract, something done or furnished in addition to or in excess of the requirements of the contract. The distinction between extra work and additional work is that the former is work arising outside and entirely independent of the contract, something not required in its performance; the latter is something necessarily required in the performance of the contract and without which it could not be carried out. 13 McQuillan, Municipal Corporations § 37.165, p. 477 (3d ed. 1950).

McQuillan says, at pages 482-84:

> Obviously extra compensation is not allowable for doing work covered by the contract notwithstanding it proves to be greater than anticipated when the contract was made; as necessary excavations through rock in constructing a sewer, or unexpected difficulties caused by

rocks in the ground, or extra work in repairing damages to the work necessarily made in order to complete the contract in a proper manner, and a promise to pay therefor is without consideration.

(Footnotes omitted.)

The work for which extra compensation was allowed by the court was work directly called for by the contract, the laying of a portion of the Enatai interceptor. The fact that some added expense may have been incurred beyond that which the contractor had anticipated does not make the work "extra" as that term is used in a construction contract.

We conclude that Dravo, the contractor, assumed the responsibility for meeting any expense occasioned by unexpected subsurface conditions, and that its loss, if any, at stations 38+00 and 30+00 to 28+86 was attributable to such conditions. The trial court erred, therefor, in allowing Dravo's claim for its cost of laying the sewer at the latter location. It correctly denied the claim based on the difficulties which Dravo encountered at station 38+00. If the trial court reaches a correct result, its judgment can be sustained upon any theory within the pleadings and the proof. *Lundgren v. Kieren*, 64 Wn.2d 672, 393 P.2d 625 (1964).

The court found that the transition problem encountered at station 30+00 resulted in 14 days' unavoidable delay in completion of the contract. Had the delay been avoidable, Metro would have been entitled to liquidated damages for these days. Since Metro did not assign error to the findings on this aspect of the case, that portion of the judgment which disallowed liquidated damages for this 14-day period will be affirmed.

Insofar as the judgment denied Dravo's claim for extra compensation for laying the sewer pipe at station 38+00, it is affirmed. The judgment allowing Dravo to recover from Metro its cost of laying the pipe at approximately stations 30+00 and 28+86 is reversed and that claim is ordered dismissed.

That portion of the judgment disallowing Metro liqui-

dated damages for the 14-day delay caused by the condition encountered at stations 30+00 and 28+86 is affirmed.

HAMILTON, C.J., FINLEY, HUNTER, HALE, McGOVERN, STAFFORD, and WRIGHT, JJ., and RYAN, J. Pro Tem., concur.