# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

KING COUNTY,

    Respondent/Cross Appellant,

    v.

VINCI CONSTRUCTION GRANDS
PROJETS / PARSONS RCI /
FRONTIER-KEMPER, JV, a
Washington join venture; and
TRAVELERS CASUALTY AND
SURETY COMPANY OF AMERICA, a
Connecticut corporation,

    Appellants/Cross Respondents,

    and

LIBERTY MUTUAL INSURANCE
COMPANY, a Massachusetts
corporation; FEDERAL INSURANCE
COMPANY, an Indiana corporation;
FIDELITY AND DEPOSIT COMPANY
OF MARYLAND, a Maryland corporation;
and ZURICH AMERICAN INSURANCE
COMPANY, a New York corporation,

    Appellants/Cross Respondents.

No. 70432-0-I

DIVISION ONE

PUBLISHED OPINION

FILED: November 9, 2015

TRICKEY, J. — The Brightwater project was King County's first major expansion of its wastewater treatment system since the 1960s.[1] It was intended to add capacity to county wastewater systems to deal with the increasing sewage from the growing region.[2] The new treatment system was to serve Snohomish County and King County residences and businesses.[3]

---

[1] Report of Proceedings (RP) at 568.
[2] RP at 568-69.
[3] RP at 569.

In 2006, King County hired a joint venture of three firms—Vinci Construction Grands Projets, Parsons RCI, and Frontier-Kemper, JV (collectively, VPFK)[4]—to construct portions of the tunneling work for the project for a fixed price and within a specified time frame. VPFK obtained a bond for the over $200 million project from five surety companies (collectively, the Sureties), which are the appellants/cross-respondents on appeal.

VPFK encountered many difficulties during the construction of the tunnels, and the project was significantly delayed as a result. When VPFK failed to meet its contractual deadlines, King County retained another contractor to complete one of the tunnels.

King County then sued VPFK and the Sureties for default. The trial court ruled in favor of King County on three summary judgment motions, dismissing two of VPFK's claims concerning differing site conditions and defective specifications.

Following a three month trial, the jury found VPFK and the Sureties jointly and severally liable for King County's single claim of default, awarding King County $155,831,471.00 in damages. The jury also awarded VPFK $26,252,949.00 in damages for some of the many claims VPFK submitted to the jury. The trial court awarded King County attorney fees and costs.

VPFK and the Sureties appeal. VPFK asserts numerous challenges to the summary judgment rulings, the jury instructions, and the trial court's ruling excluding evidence. The Sureties appeal the trial court's award of attorney fees. King County cross-

---

[4] Clerk's Papers (CP) at 3. Vinci Construction Grands Projets is a global construction firm headquartered in Paris, France, and is a subsidiary of Vinci Construction, one of the largest construction and engineering conglomerates in the world. RP at 430, 476. Vinci Construction Grands Projets owned 60 percent interest in the joint venture and led the decision-making. RP at 1793. Parsons RCI and Frontier-Kemper are American construction companies that have substantial experience in large tunneling projects. RP at 1477, 4512-13, 4846.

appeals, asserting that the trial court erred by denying its motion for judgment as a matter of law.

We affirm the trial court's summary judgment, evidentiary, and jury instruction rulings challenged by VPFK. We also affirm the trial court's denial of King County's motion for judgment as a matter of law. Finally, we affirm the award of attorney fees to King County, and award attorney fees to King County on appeal.

FACTS

I.    The Brightwater Project's Conveyance System

The Brightwater project was comprised of two major components: (1) a new treatment plant and (2) a conveyance system composed of pipelines and pumps that would carry raw sewage to the treatment plant and, in turn, carry clean effluent from the plant to Puget Sound.[5] The conveyance system called for the construction of 13 miles of pipelines in underground tunnels, the excavation of which was divided into three contracts: tunnel segment BT-1 (East Contract); tunnel segments BT-2 and BT-3 (Central Contract); and tunnel segment BT-4 (West Contract).[6]

II.   The Contract Documents

King County (County) and its consultants began designing the Brightwater contract and the subcontracting documents in 2002.[7] They conducted site investigations, soil analysis, and drafted the specifications and the bid documents.[8] The County provided the bidders for the Central Contract with numerous bid documents (Contract Documents). These documents included the contract (Contract) itself and its "General Terms and

---

[5] RP at 568-70.
[6] RP at 570, 2034.
[7] RP at 2648.
[8] RP at 2648.

Conditions" and "General Requirements" for performance of the Central Contract work, as well as two geotechnical reports to assist in preparing the bids—the Geotechnical Data Report (GDR) and the Geotechnical Baseline Report (GBR).[9]

### a. The Contract

#### i. Selection of Slurry Tunnel Boring Machine

According to the County's February 2004 "Predesign Report," the new tunnel would be situated below the "groundwater table."[10] External pressures below the groundwater table meant that the soil surrounding the future tunnel would be saturated with water.[11] These conditions required the use of a boring machine that could apply constant pressure to prevent the face of the tunnel from collapsing.[12] However, a limited number of tunnel boring machines were well suited for such conditions.[13] The Predesign Report advised the County to use an earth pressure balance machine (EPBM) or a slurry tunnel boring machine (STBM).[14]

The County selected an STBM over an EPBM because the BT-3 tunnel was anticipated to experience high pressures, and at the time, STBMs had the ability to operate in higher pressures than EPBMs.[15] The County incorporated the STBM specification into the Contract.[16]

#### ii. Differing Site Conditions Clause

---

[9] CP at 318, 383.
[10] Exhibit (Ex.) 6 at KC0059086; 0059101.
[11] RP at 3575.
[12] RP at 3576. The "face" of the tunnel refers to the ground surface directly in front of the tunnel boring machine. RP at 1078.
[13] RP at 3577.
[14] Ex. 1143 at KC0059110.
[15] RP at 2040; Ex. 1611 at KC-EM-0050757.
[16] Ex. 6 at KC0001022.

The Contract contained a "Differing Site Conditions" clause, which allowed VPFK to request an equitable adjustment in contract time or price if it encountered site conditions different than those indicated in the Contract Documents.[17] The Contract identified two categories of Differing Site Conditions: "Type I" and "Type II". At issue here is a Type I "Differing Site Condition[]," defined as "[s]ubsurface or latent physical conditions at the site which differ materially from those indicated in the Contract Documents."[18]

### iii. Interventions and Pressurized Conditions

The Contract also included provisions about interventions.[19] During an intervention, the contractor stops the tunneling and conducts an inspection or repair on the cutterhead (the front of the boring machine that contains the large soil-cutting tools).[20] The contractor needs to have a reasonable understanding of the ground conditions in order to choose the proper slurry and pressure specifications. The correct slurry and pressure levels enable the STBM to support the tunnel face during excavations and interventions.[21] Thus, the Contract specified the percentages of the tunnel alignment[22] in which the contractor could expect to encounter varying levels of pressure for purposes of "[S]TBM Stoppages":

> 1. The required face support to perform Maintenance, and Boulder Stops will vary. For baseline purposes assume the following:
>    a. Thirty percent will be at locations where Required Face Support is equal to atmospheric pressure.

---

[17] Ex. 6 at KC0000443.
[18] CP at 274. A Type II Differing Site Condition is not relevant to this appeal.
[19] Ex. 6 at KC0001032.
[20] RP at 577, 2320.
[21] RP at 1278, 3511, 3596.
[22] The "tunnel alignment" or "alignment" refers to the route of the tunnels. RP at 572.

     b. Twenty percent will be at locations where Required Face Support will be less than 50 [pounds per square inch (psi)], but greater than atmospheric pressure.

     c. Fifty percent will be at locations where Required Face Support will be greater than 50 psi, and not more than 75 psi.[23]

The Contract did not indicate what the pressure would be at any particular location in the tunnel.[24]

     b.    The Geotechnical Data Report (GDR) & the Geotechnical Baseline Report (GBR)

The GDR contained raw data about the geotechnical conditions along the BT-2 and BT-3 tunnel alignments. The GDR included data on soil samples extracted from boreholes drilled approximately 300 to 400 feet apart along the tunnel alignments.[25] The GDR indicated the location of the boreholes and presented the results of tests performed on the soil samples.[26]

The GBR interpreted the raw data from the GDR.[27] Among other things, the GBR identified four general types of soils or tunnel soil groups (TSGs)[28] that contractors could expect to encounter, either individually or in combination, during excavation of the BT-2 and BT-3 tunnel alignments, totaling 12 types of soil conditions.[29] The GBR also showed the location of the boreholes and depicted the TSGs present at different depths within the

---

[23] Ex. 6 at KC0001033.
[24] RP at 738. Ex 6 at KC0001033.
[25] RP at 717, 1064, 2925; CP at 252, 381.
[26] CP at 252, 381.
[27] CP at 383-468.
[28] The TSGs were labeled by color: Teal, Purple, Red, and Yellow. For example, "Teal TSG" referred to "fine-grained, plastic soils." Ex. 7 at KCC0001789.
[29] CP 253, 404-06, 433-35; Ex. 7 at KCC0001789.

boreholes.[30] The GBR provided baseline estimates of the expected percentages of TSGs or TSG combinations along the BT-2 and BT-3 tunnel alignments.[31]

III.   VPFK's Bid for the Central Contract

The County submitted the Contract Documents for the Central Contract to the bidders on January 19, 2006.[32]

VPFK submitted a bid for the Central Contract. To develop its tender for the Central Contract, VPFK reviewed and analyzed the Contract Documents, including the specifications and plans, and information about the boreholes, soil profiles, and water tables.[33] VPFK also retained several consultants to assist it in preparing its bid. VPFK hired geotechnical consultant Joseph Guertin[34] of GZA GeoEnvironmental, Inc. (GZA) to "[p]rovide professional opinions about the technical accuracy of the GBR."[35] VPFK also hired geotechnical expert Jean Launay to prepare a report about the expected tunnel conditions.[36]

Relying on the information set forth in the GBR, Guertin prepared a report that included color-coded charts identifying the dominant soils in the tunnel.[37] Like Guertin's report, Launay's report identified the dominant soils along sections of the tunnel, at intervals of approximately 30 feet.[38] To estimate the soil conditions along the 30-foot

---

[30] CP at 253, 400-01, 430-32.
[31] CP at 408, 433-35; Ex. 7 at 1789-91, 1820-21.
[32] RP at 2649.
[33] CP at 842.
[34] CP at 498.
[35] CP at 496.
[36] CP at 511, 521; Ex. 1048.
[37] Ex. 1364 at 8-10 (Figures 1-3); RP at 7693. Guertin testified that the term "dominant" implies "the conditions which you will see most of the time and which will control, but implies variability as well." CP at 7709.
[38] Ex. 1048 at KC0090924-27; RP at 2953-54.

intervals, Launay applied a method called "interpolating," which he later described as an "assumption" in which one "consider[s] that in between two bore hole[s] there is a continuity of the material in between the two bore holes."[39]

In June 2006, the County awarded the Central Contract to VPFK, which had submitted the lowest bid of $209,756,058.00.[40] In August 2006, the County issued VPFK a Notice to Proceed.[41] The Contract Documents provided that VPFK had 1,540 days after issuance of the Notice to Proceed to substantially complete the project.[42]

IV.  VPFK's Performance and Payment Bond

As required by RCW 39.08.010, VPFK obtained a performance and payment bond (Bond) from the Sureties.[43] Under the Bond, VPFK was the principal and the County was the obligee.[44] The Sureties bound themselves "in the full sum of the Contract Price . . . for the faithful performance" of the Contract.[45] The Sureties' obligation would be triggered by VPFK's default: "[W]henever Contractor shall be, and declared by Owner to be in default under the Contract, the Owner having performed Owner's obligations thereunder, the Surety, at the request of the Owner, shall promptly remedy the default in a manner acceptable to the Owner."[46]

V.  Request for Change Orders

---

[39] RP at 2954-55.
[40] RP at 581, 2649, 2656. Because Brightwater was a public works project, the County was required to comply with RCW 36.32.250, which requires the County to award the contract to the lowest bidder. RP at 579.
[41] RP at 2656.
[42] Ex. 6 at KC0000600.
[43] Ex. 6 at 112; CP at 6993.
[44] Ex. 3001 at 1.
[45] Ex. 3001 at 1.
[46] Ex. 3001 at 1.

Soon after VPFK began the tunneling work, and throughout the course of the project, it complained of many difficulties it encountered, which it claimed contributed to the significant delays in completion of the project.[47] VPFK submitted numerous Requests for Change Orders (RCOs) to the County, asking for extensions of time and reimbursement of costs incurred in handling these difficulties.

In particular, at issue here are RCOs 65 and 66, which VPFK submitted to the County on November 7, 2008. RCO 65 was entitled, "Notice of Differing Site Condition, Request for Change Order No. 65 for Increased Hyperbaric Work."[48] VPFK claimed that as of October 31, 2008, it encountered no atmospheric pressures, that 62 percent of its interventions were at less than 50 psi, and that 38 percent of its stops were between 50 and 75 psi.[49] This was significantly different from that which was projected in the Contract Documents.[50] As an alternative to a differing site condition claim, VPFK stated the RCO could also be characterized as a defective specification claim.[51]

In RCO 66, "Notice of Differing Site Condition and Defective Specification, Request for Change Order No. 66 for Tunnel Delays,"[52] VPFK asserted, in part, that the soil conditions "encountered are materially different from what was anticipated."[53] RCO 66 asserted that the frequency of transitions between one soil condition and another was

---

[47] RP at 922, 2791, 3805-07, 4184, 4308, 4826-27.
[48] Ex. 1514. "Hyperbaric" refers to work that needs to be performed in compressed air, where the pressures are higher than the atmospheric pressures. RP at 737.
[49] Ex. 1514 at VPFK_E_000210023.
[50] As detailed above, the Contract Documents represented that VPFK would be able to perform 30 percent of its interventions at atmospheric pressure, 20 percent at pressure less than 50 psi, and 50 percent at pressures between 50 psi and 75 psi. Ex. 6 at KC0001033.
[51] Ex. 1514 at VPFK_E_000210022, VPFK_E_000210023.
[52] Ex. 68 at KC0090655.
[53] Ex. 68 at KC0090655.

higher than what was indicated in the GBR and what was anticipated.[54] VPFK claimed that the increased number of changes in the soil caused a substantial slowing of the progress because the operators had to adjust the STBM parameters and slurry composition more often. As a result, "the number of stoppages and resulting hyperbaric interventions . . . greatly exceeded the anticipated number."[55] RCO 66 also stated that "[o]verall, it appears that the plans and specifications prepared for this project were defective, with regard to the ability of the prescribed method of construction to complete the project, in the ground conditions actually encountered in the tunneling alignment, within the timeframes specified in the contract."[56]

In an attempt to resolve RCOs 65 and 66, on April 21, 2009, VPFK submitted to the County expert reports concluding that VPFK acted reasonably and consistently when its experts interpolated the soil conditions along the tunnel alignment.[57] Although the County agreed that it may have been necessary for VPFK to prepare interpretative documents of the GBR in order to bid, plan, and execute the work, the County rejected VPFK's claim that its own experts' interpretation of the soil conditions should be the baseline for evaluating its differing site condition claims.[58] The County deferred ruling on VPFK's RCOs until further information about the soil could be collected.[59]

On January 22, 2010, the County rejected RCO 66, concluding that VPFK failed to show that the actual soil conditions were different from what the Contract Documents

---

[54] Ex. 68 at KC0090655.
[55] Ex. 68 at KC0090655.
[56] Ex. 68 at KC0090657.
[57] Ex. 110 at KC0090859, KC0090864, KC0090865, KC0090866, KC0090879, KC00909.
[58] Ex. 110 at KC0090859.
[59] Ex. 128.

indicated.[60] That same day, the County deferred its final decision on RCO 65 until the conclusion of mining.[61]

## VI. Damage to the STBMs and Expert Panel

In May 2009, VPFK workers discovered that the rims of both STBMs were damaged, and all mining stopped.[62] VPFK believed the damage was caused by unexpected abrasive soil it had encountered.[63] Additionally, both machines were under pressures exceeding 75 psi.[64]

In July 2009, VPFK and the County convened a jointly selected panel of international experts, including representatives from the County's Brightwater design team and independent experts.[65] VPFK informed the panel of its plans to reduce the pressures at the STBM locations so that repairs could be conducted at atmospheric pressure.[66] VPFK proposed to do this by "dewatering": drilling wells at the STBM locations and pumping out the water.[67] The panel agreed with VPFK's plans to repair the machines.[68] The panel also recommended that planned cutterhead maintenance and inspection stops be conducted at atmospheric pressure, opining that interventions at reduced pressure without dewatering or depressurization was not a good option.[69] The

---

[60] CP at 5405.
[61] CP at 5405.
[62] RP at 754-56.
[63] Ex. 141 at KC0091630-31, Ex 145 at KC_EM_0003151.
[64] RP at 754, 2690-91, 2807; Ex. 1620 at 1.
[65] RP at 1198, 780, 3482-83; Ex. 126 at 3, Ex. 128 at KC_EM_000499, Ex. 1635 at KC-EM-0061197, Ex. 1649 at 2.
[66] RP at 781.
[67] RP at 781-81, 3112; Ex. 1649 at 6.
[68] RP at 781.
[69] RP at 974; Ex. 1649 at 11.

panel recommended that boreholes to test soil conditions be drilled every 200 or 300 feet and that safe havens be created every 1,000 feet by pumping water from the ground.[70]

The County concluded that it was not feasible to comply with the panel's recommendations.[71] The County also denied VPFK's RCOs to implement the safe haven and borehole plans on the basis that this was "means and methods of VPFK" for which the County should not have to pay.[72] Nevertheless, the County authorized VPFK to build safe havens or low pressure workspaces to repair the BT-2 STBM.

## VII.   VPFK's Default and Subsequent Completion of Tunnels

The panel made its recommendations in July 2009. By October 2009, VPFK had not started to repair either STBM and was one year behind schedule.[73] However, the County expected to incur substantial costs because of VPFK's delays.[74] On October 28, 2009, the County issued a notice of default to VPFK.[75] The County asked VPFK to submit a corrective action plan for substantially completing the project within the contract time.[76] The Sureties were notified of King County's notice of default to VPFK on October 29, 2009.[77]

VPFK submitted a corrective action plan on November 13, 2009.[78] This plan included a substantial completion date of December 22, 2011.[79]

---

[70] RP at 633, 784, 787, 974, 2647; Ex. 1649 at 13-14.
[71] RP at 631.
[72] RP at 1162, 2752-53; Ex. 1690 at KC009442, Ex. 1696.
[73] RP at 1198-99, 2031-32.
[74] Ex. 142 at VPFK_EM 00171390.
[75] Ex. 142 at VPFK_EM 00171390.
[76] Ex. 142 at VPFK_EM 00171388, 90.
[77] CP at 6988-94.
[78] Ex. 145.
[79] Ex. 145 at KC_EM_0003171.

On December 8, 2009, the County told VPFK that because its projected substantial completion date was much later than the Contract provided, the schedule proposed did not cure the default.[80]

Subsequently, VPFK told the County that it could complete the mining of the BT-3 tunnel on December 15, 2012.[81] It estimated that additional costs to the County could amount to $98 million.[82]

On February 15, 2010, after an extensive mediation process, VPFK and the County entered into an Interim Agreement, which allowed the County to delete the remaining BT-3 tunneling work from VPFK's contract and hire JayDee Coluccio (JDC), the BT-4 tunnel alignment contractor, to finish the BT-3 alignment.[83] The County would issue a change order deducting the remainder of the work on the BT-3 tunnel alignment from VPFK's contract.[84] The County also reserved its right to pursue a default claim against VPFK without formally terminating VPFK's contract.[85]

In February 2010, VPFK completed the repair of the BT-2.[86] On February 25, 2010, the County and VPFK entered into another agreement in which the County agreed to pay VPFK up to $5,000,000.00 in incentives if it finished the BT-2 tunneling work by the new agreed deadline of November 5, 2010.[87] VPFK met those deadlines and the County paid the full incentive payment.[88]

---

[80] CP at 5403.
[81] Ex. 152.
[82] Ex. 152.
[83] Ex. 3019 at 2, Ex. 152.
[84] Ex. 152.
[85] Ex. 152.
[86] RP at 1357-60, 1970, 2211, 3159, 3201; Ex. 128 at KC_EM_000499-501.
[87] Ex. 155.
[88] RP at 4958.

On February 26, 2010, the County sent a letter to VPFK's counsel, seeking several assurances from the Sureties, including that the County had "satisfied all notice requirements so as to preserve its position that (a) VPFK is in default and consequently (b) both VPFK and the surety are liable for the cost overrun of completing the BT-3 mining work."[89]

In its March 2010 response, the Sureties stated that it "reserves all of its rights and defenses to dispute the alleged underlying default which gave rise to King[] County['s] retention of [JDC,] including the reasonableness of any compensation paid by King County to [JDC] in connection with the BT-3 work" and that it "further reserves all of VPFK's rights, defenses, and claims of any nature or description, under the bonded contract, at law or equity."[90]

In a March 2010 letter to VPFK's counsel, the County requested that pursuant to the Bond, the Sureties had a duty to correct VPFK's defaults.[91] The Sureties denied VPFK's default. In a letter to the County, the Sureties asserted:

> [W]e believe that, to the extent VPFK failed to comply with its contractual obligations, such failure was the result of defective specifications, DSCs and/or cardinal change in the Contract. **VPFK is not in default** of its contract obligations and the County has not performed its obligations thereunder. **Accordingly, the County's claim is respectfully denied.**[92]

On April 19, 2010, the County signed a contract with JDC to complete the BT-3 tunnel work.[93] JDC's machine was an EPBM.[94] Before signing the contract, JDC was close to completing its work on the BT-4 tunnel, and its EPBM was relatively close to the

---

[89] Ex. 3014 at 2.
[90] Ex. 3015 at 2.
[91] Ex. 3016 at 3.
[92] Ex. 162 at 20-21 (emphasis added).
[93] Ex. 3022.
[94] CP at 5409.

BT-3 alignment and at the same depth as VPFK's STBM.[95] JDC used its EPBM to complete the work and did so sooner than VPFK's projected timeline.[96]

VIII.  Procedural History

The County filed suit against VPFK and surety Travelers in April 2010.[97] The County's second amended complaint alleged that Travelers breached the Contract by failing to remedy VPFK's default under the Bond and that the surety was jointly and severally liable to the County for all costs arising from this default.[98] The remaining four Sureties intervened as defendants.[99]

VPFK asserted several defenses and counterclaims.[100] It alleged that the County's plans and specifications were defective and that the County breached the Contract by refusing to grant orders and time extensions for differing site conditions.[101] One of VPFK's differing site condition claims was that the transitions between plastic and non-plastic soils were much more frequent than that which was indicated in the Contract Documents.[102] VPFK also alleged that the County's specification of the "STBM method" and its allotment of contract time were defective.[103] In their pleadings, the Sureties denied the County's default claim.[104]

---

[95] CP at 5408; RP at 810.
[96] CP at 5410.
[97] CP at 1-14.
[98] CP at 43.
[99] CP at 1433.
[100] CP at 48-93.
[101] CP at 72-76.
[102] CP at 73.
[103] CP at 75.
[104] CP at 95, 139.

All of the parties filed numerous summary judgment motions.[105] At issue on appeal are three of these motions: (1) the County's motion for partial summary judgment on VPFK's counterclaim for differing site conditions based on the transitions between plastic and non-plastic soils; (2) the County's motion for partial summary judgment on VPFK's counterclaim for defective specification of the STBM machine and contract time; and (3) VPFK's motion for partial summary judgment limiting the County's recovery of liquidated damages to delay-related damages.[106] The trial court granted the County's motions and denied VPFK's motion.[107]

Trial was held from September 12 to December 6, 2012. While the County submitted a single claim to the jury for default on the Contract, VPFK submitted over a dozen defenses and claims.[108] Apart from VPFK's claims that were dismissed on summary judgment (i.e., differing site condition claim as to frequency of transitions between soils and defective specification claim as to the designation of the STBM), VPFK submitted claims to the jury based on RCOs 65 and 66.[109] With regard to RCO 65, the jury found that VPFK proved that it had "encountered pressures different than the 30/20/50 baseline in the Contract" and that "the Washington State Department of Labor and Industries imposed unanticipated work restrictions and medical requirements for hyperbaric work."[110] With regard to RCO 66, the jury found that VPFK proved that "the soil abrasivity encountered during tunneling is a Type I differing site condition" and that "the types and percentages of face conditions encountered is a Type I differing site

---

[105] CP at 1082-83.
[106] CP at 181-199, 249-67, 542-64.
[107] CP at 1083.
[108] CP at 1317-29, 4543-54.
[109] CP at 4544-51.
[110] CP at 4544-45.

condition"[111] For these and other claims, the jury awarded VPFK damages totaling $26,252,949.00.[112]

The jury also found, however, that VPFK was in default under the contract, and awarded the County the entire amount of alleged damages of $155,831,471.00.[113] The trial court awarded the County prevailing party attorney fees and costs totaling $14,720,387.19.[114]

VPFK and the Sureties appeal; the County cross-appeals.

## ANALYSIS

### I. Differing Site Condition Claim

VPFK first contends that the trial court erred by dismissing on summary judgment its differing site condition claim. Specifically, VPFK asserts that it encountered more frequent changes between plastic and non-plastic soils than the Contract Documents indicated.[115]

"The standard of review of an order of summary judgment is de novo, and the appellate court performs the same inquiry as the trial court." Smith v. Safeco Ins. Co., 150 Wn.2d 478, 483, 78 P.3d 1274 (2003). Summary judgment is proper if the pleadings, affidavits, depositions, and admissions on file demonstrate that there are no genuine issues of material fact, and that the moving party is entitled to judgment as a matter of law. CR 56(c).

---

[111] CP at 4547-48.
[112] CP at 1318-29.
[113] CP at 4541-42.
[114] CP at 4561.
[115] CP at 69, 73, 76.

We focus first on the question of what legal standard applies when determining the validity of a differing site condition claim. In answering this question, we are guided by two Washington decisions: Maryland Casualty Co. v. City of Seattle, 9 Wn.2d 666, 116 P.2d 280 (1941) and Basin Paving Co. v. Mike M. Johnson, Inc., 107 Wn. App. 61, 27 P.3d 609 (2001).

In Maryland Casualty, the contractor was hired to build a sewer following its successful bid. 9 Wn.2d at 668. While excavating the tunnel, he encountered ground that was too wet and soft to proceed. Maryland Casualty, 9 Wn.2d at 669. The contractor had to work under compressed air to complete the job, which greatly increased his costs. Maryland Casualty, 9 Wn.2d at 669. As a result, the contractor claimed he was entitled to these extra costs. Maryland Casualty, 9 Wn.2d at 669.

In reviewing the contractor's claim, the Washington Supreme Court announced the "basic principle of law" applicable in these circumstances:

> The general rule may be deduced from the decisions that where plans or specifications lead a public contractor reasonably to believe that conditions indicated therein exist, and may be relied upon in making his bid, he will be entitled to compensation for extra work or expense made necessary by conditions being other than as so represented.

Maryland Casualty, 9 Wn.2d at 670 (internal quotation marks and citation omitted).

In Basin Paving, a public works contract involving heavy excavation included a differing site conditions clause. 107 Wn. App. at 62-64. The town of Lind had conducted boring tests along the tunnel at 50-foot intervals, and created drawings based on those tests. Basin Paving, 107 Wn. App. at 63. During excavation, however, the contractor encountered more rock than anticipated and sought additional compensation from the town. Basin Paving, 107 Wn. App. at 63.

18

The contractor argued that the unexpected amount of rock was a compensable changed condition because it exceeded the town's projections based on the boring tests. Basin Paving, 107 Wn. App. at 65. The Court of Appeals, Division Three disagreed, holding that "[r]ecovery is . . . limited to when the 'condition complained of could not reasonably have been anticipated by either party to the contract.'" Basin Paving, 107 Wn. App. at 65 (quoting Bignold v. King County, 65 Wn.2d 817, 821-22, 399 P.2d 611 (1965)). The court concluded, "[A] contractor cannot recover additional compensation for a 'changed condition' if the complained of condition was foreseeable." Basin Paving, 107 Wn. App. at 67-68 (quoting Bignold, 65 Wn.2d at 822).

From these decisions, we discern the following requirements for establishing a differing site condition claim:

(1) the contract documents indicated certain conditions,
(2) the contractor reasonably relied on those indications when making its bid,
(3) actual conditions materially differed from those which were indicated in the contract, and
(4) the materially different conditions were not foreseeable.

Applying this test here, we conclude that VPFK has failed to satisfy the first two elements. First, VPFK failed to demonstrate that the Contract Documents specifically indicated the frequency of transitions between plastic and non-plastic soils. VPFK concedes this point.[116] Although the GBR identified the types of soils a contractor could expect to encounter, categorized according to TSGs, the Contract Documents provided no baseline for the number of "transitions" between different kinds of soil conditions.[117]

The record contains numerous admissions by VPFK that the Contract Documents contained neither location-specific baselines for the soil types between the boreholes nor

---

[116] Br. of App. at 22, 40.
[117] CP at 404-06, 408, 433-35.

indications of expected transitions from plastic to non-plastic soils. For example, Dr. Ronald Heuer, VPFK's expert witness, confirmed that "the GBR contains no baseline for expected number of changes in face composition."[118] He later testified that the Contract Documents did not provide any baseline for the number of expected transitions from plastic to non-plastic soils.[119] Launay recognized that although the GBR provided baselines for face conditions that would be encountered as a percentage of the whole tunnel alignment, the report did not provide location-specific baselines for any type of soil condition.[120] He also acknowledged that the GBR did not indicate any specific location of any particular face condition would be encountered,[121] as did Jean-Pierre Debaire, the lead estimator for VPFK[122] on the Central Contract bid.[123]

VPFK argues that even though there was no explicit representation in the Contract Documents about the frequency of transitions in the soil, a question of fact remains about whether its assumptions about the soil conditions amounted to a reasonable interpretation of the Contract Documents. VPFK contends that neither the Contract Documents nor case law require an express representation about ground conditions in order to pursue a differing site conditions claim. Rather, VPFK asserts, all that is required is an indication, which may be proven by inferences and implications.

Even if Washington recognized this additional element of reasonable interpretation, however, VPFK's claim still fails because the Contract Documents

---

[118] CP at 475.
[119] CP at 483.
[120] CP at 523.
[121] CP at 524.
[122] CP at 530.
[123] CP at 534 (confirming that although the GBR showed, to some extent, where some of the typical face conditions were inside the boreholes, it did not show where any of the face conditions were located outside or between the boreholes, or what soils were between the boreholes).

contained no indication, express or implicit, as to the number of transitions. The authorities VPFK cites support this conclusion. <u>See, e.g.</u>, <u>Renda Marine, Inc. v. United States</u>, 66 Fed. Cl. 639, 651 (2005) (a "differing site condition cannot exist where 'the plans and specifications do not show or indicate anything about the alleged unforeseen condition, i.e., if they say nothing one way or the other about [the subsurface condition].'" (alteration in original) (internal quotation marks omitted) (quoting <u>United Contractors v. United States</u>, 177 Ct. Cl. 151, 368 F.2d 585, 595 (1996))); <u>Foster Constr. C.A. and Williams Bros. Co. v. United States</u>, 193 Ct. Cl. 587, 603 (1970) ("[A] contract silent on subsurface conditions cannot support a changed conditions claim . . . .").

Nor does Washington case law or the Contract Documents support VPFK's argument that the County should be liable for its own interpretations of the Contract Documents. Washington courts have rejected differing site condition claims where the public works contract disclaimed liability for information it provided about subsurface information or gave no information about subsurface information. <u>See, e.g.</u>, <u>Basin Paving</u>, 107 Wn. App. 61 (court rejected contractor's differing site condition claim where the city disclaimed liability for the accuracy of boring tests and for any conclusions drawn therefrom); <u>Dravo Corp. v. Municipality of Metro. Seattle</u>, 79 Wn.2d 214, 484 P.2d 399 (1971) (court refused to grant contractor additional compensation for a differing site condition claim where city disclaimed accuracy of subsurface test results and contractor assumed risk by agreeing to terms of contract).

Here, the Contract Documents explicitly stated that bidders should make their own interpretations and conclusions about the soil conditions along the tunnel. Importantly,

the Contract Documents included a provision that shifted to the contractor any risk of assumptions made by the contractor that differed from the County's data:

> The Contractor may make its own interpretations, evaluations, and conclusions as to the nature of the geotechnical materials, the difficulties of making and maintaining the required excavations, and the difficulties of doing other work affected by geotechnical conditions, **and shall accept full responsibility for making assumptions that differ from the baselines set forth in the GBR.** In making such interpretations, evaluations, and conclusions, use the Contract geotechnical documents and the available geotechnical information. The Contractor may conduct other investigations and tests it deems appropriate. Any additional Contractor obtained investigation and test information shall be shared with the Owner.[124]

Furthermore, in a "Warranty Statement" contained in the GBR, the County cautioned bidders that the "geotechnical baseline conditions contained herein are not necessarily geotechnical fact; the actual conditions encountered will be representative of the range of values, but the locations at which they are encountered will vary."[125]

The trial court properly ruled that "there had been no representation . . . as to the frequency or number of transition[s] except that there would be frequent transitions and that the soil conditions were variable."[126] Accordingly, VPFK did not establish the first element of a differing site condition claim.

VPFK also failed to establish the second element of a differing site condition claim—that it reasonably relied on contract indications when preparing its bid. The record does not support VPFK's claim that it retained Launay and Guertin to analyze the locations and expected frequency of transitions between plastic and non-plastic soils based on the County's data.[127]

---

[124] CP at 845 (emphasis added).
[125] CP at 397.
[126] CP at 1083.
[127] Br. of App. at 36.

Launay's 2006 report about the expected tunnel conditions contained no prediction of the number of soil transitions between plastic and non-plastic soils.[128] Launay was asked in deposition if "anybody at Vinci or VPFK . . . tried to map out specific locations where the 12 typical face conditions would be found." Launay responded, "[N]ot to my knowledge," adding that it would be "foolish to try" to map the locations of particular soil conditions.[129] Launay stated that he did not give a foot-by-foot definition of the soils because he believed it would not be helpful in calculating the bid estimate.[130]

Although Guertin's report identified the dominant soils at locations along the tunnel alignments, Guertin noted that "it [would] be difficult, if not impossible, to determine actual face conditions except when the machine is stopped and the front chamber evacuated to permit inspection and maintenance."[131] He confirmed the report's "approximate prediction" that the soil at the tunnel face may change every 50 to 100 feet.[132] When asked whether he was requested to evaluate the frequency of changes in face conditions between plastic and non-plastic soils, Guertin replied, "Not that I recall."[133] He explained that he did not believe it was possible to determine the number of transitions between the groups of soils.[134]

Debaire testified that in preparing for the bid, it was impossible to determine the exact composition of the soils between the boreholes.[135] According to Debaire, no one believed it was important to count the number of times the soils would change along the

---

[128] CP at 525, Ex. 1048.
[129] CP at 524.
[130] CP at 522.
[131] Ex. 1364 at 6.
[132] CP at 490.
[133] CP at 493.
[134] CP at 494.
[135] CP at 534.

tunnel alignment or that it was even possible to do so.[136] Debaire's estimate did not count the number of changes in the soils.[137]

We also note that at oral argument on the County's motion, the trial court repeatedly asked VPFK's counsel for evidence establishing VPFK's reliance on a particular estimate of the frequency of soils transitions.[138] VPFK's counsel produced no such evidence.[139]

VPFK failed to establish material questions of fact that the Contract Documents indicated the frequency of transitions between soil conditions and that VPFK reasonably relied on those indications when tendering its bid. The trial court correctly dismissed VPFK's differing site condition on summary judgment.

## II.    Defective Specification Claim

Next, VPFK asserts that the trial court erred by summarily dismissing its defective specification claim. It contends that it raised genuine questions of fact that the County's plans and specifications, which required VPFK to use an STBM, were defective. We disagree.

"It is a well established rule in Washington that when . . . a contractor is required to build in accordance with plans and specifications furnished by the owner, it is the owner, not the contractor, who impliedly guarantees that the plans are workable and sufficient." Weston v. New Bethel Missionary Baptist Church, 23 Wn. App. 747, 753-54, 598 P.2d 411 (1978) (citing several Washington decisions).

---

[136] CP at 535.
[137] CP at 536.
[138] RP 7/13/2012 at 83-98.
[139] RP 7/13/2012 at 83-98.

In its answer to the County's complaint, VPFK summarized its defective specification claim:

King County warranted that the STBM method it chose for this project could successfully complete the work in the ground conditions encountered in the time frame allowed. If the actual ground conditions encountered are what should have been anticipated based on the Contract Documents (which VPFK refutes), then King County's **specification of a STBM and allotment of contract time** was defective.[140]

The trial court dismissed this claim, finding no material fact that the designation of the STBM was defective.[141]

VPFK presented evidence that as early as 2005, when the Contract was 60 percent complete, the County acknowledged that specification of the STBM raised an implied warranty that only an STBM could complete the tunnel drives.[142] The County's experts reviewing the contract at the time acknowledged the risk that was attached to specification of the STBM, and understood that the STBM would experience some problems in making it through the drive.[143] VPFK pointed to this evidence to support its argument that the County was aware that it could be potentially liable for a defective specification claim if the STBM did not work properly.[144]

But although VPFK's evidence tends to show the County's awareness of potential risk associated with selecting the STBM, there was no evidence that a machine other than the STBM could effectively accomplish the task of boring the site-specific tunnel drives. The County ultimately selected the STBM because it was found that an EPBM

---

[140] CP at 75 (emphasis added).
[141] CP at 1083.
[142] CP at 678, 761.
[143] CP at 782.
[144] CP at 678.

could not control the external pressures.[145] The County's design team concluded that "the risks associated with driving the tunnels with an EPB[M] far out-weigh the risks of requiring a [S]TBM."[146]

In addition, the evidence before the trial court on summary judgment was that VPFK actually preferred the STBM over the EPBM.[147] In an April 5, 2006 e-mail, Thierry Portafaix, VPFK's project manager[148] stated, "The choice to use a [S]TBM was imposed by the client, but it satisfies our own selection criteria."[149] In a deposition, Portafaix testified that VPFK was experienced with STBM technology, which gave it an advantage in the bid.[150] Werner Burger, the chief engineer of VPFK's STBM supplier, Herrenknecht, sent an e-mail on February 7, 2006 to VPFK stating that "the preferred solution is a slurry TBM because of better potential to operate under highest face pressure and lower risk for the need of chamber access. . . ."[151] Burger also testified that he believed there was nothing defective or wrong with the specification of an STBM.[152]

VPFK contends that JDC's use of an EPBM to complete the BT-3 tunnel created a material issue of fact about whether it was feasible to excavate the BT-3 tunnel using a different machine. However, the record shows that the County hired JDC and approved its use of an EPBM because JDC's machine was the best and only available option at the time.[153]

---

[145] CP at 761.
[146] CP at 761.
[147] Br. of Resp't at 45.
[148] CP at 473.
[149] CP at 221.
[150] CP at 227.
[151] CP at 231.
[152] CP at 239.
[153] CP at 5407-09.

26

VPFK's additional allegations concerning the defective specification of the STBM do not persuade us. VPFK made many of its complicated arguments on defective specification as alternatives to a differing site condition claim. VPFK presented these same arguments as differing site condition claims to the jury. For example, VPFK asserted that the specification of the STBM was defective because the atmospheric pressures within the tunnel were much higher than anticipated and made the work more expensive and less efficient.[154] In effect, this claim is a differing site condition claim; the Contract Documents improperly predicted the locations of no or low pressure areas in order to perform interventions.

Furthermore, to the extent that VPFK's implied warranty argument related to difficult conditions of the soil—such as the unpredictable soil encountered, the abrasivity of the pressure, the face instabilities, or the variation of face conditions—VPFK also presented these arguments as differing site condition claims to the jury.[155]

VPFK argues that the following evidence was not considered by the court and demonstrates that the plans and specifications were defective in their prescriptions of *how to use* the STBM: (1) the increased frequency of transitions between soil types; (2) the lack of provision in the Contract for additional exploratory holes to accommodate interventions of the STBM; and (3) tunnel face instability.[156] But none of this evidence created a material issue of fact as to defective specification. Again, they were differing

---

[154] CP at 69.
[155] CP at 4544-51.
[156] Br. of App. at 48-49.

site condition claims that were disposed of at summary judgment, presented to the jury,[157] or settled before trial.[158]

We conclude that the trial court's ruling was limited to the designation of the STBM, and VPFK failed to create a material question of fact that the STBM was defective. VPFK's additional, related allegations were either disposed of in the trial court's differing site conditions summary judgment ruling or were presented to the jury as separate differing site conditions claims. No material question of fact remained as to whether VPFK's specifications were defective.

III.    Implied Warranty Jury Instruction

VPFK next contends that the trial court erred by declining to give the jury its proposed jury instructions on its implied warranty claim concerning ground improvements.

VPFK proposed the following jury instructions:

> You are instructed that when the County, as here, furnishes plans and specifications for a construction project to a Contractor, the County warrants that those plans are adequate to accomplish the work. This warranty applies to all plans, specifications, and subsurface information furnished by the County, regardless of whether the County actually prepared those documents or hired another firm to prepare the documents.
>
> Where plans or specifications lead a Contractor such as VPFK reasonably to believe that conditions represented in those documents do exist and may be relied upon in bidding, the Contractor is entitled to compensation for extra expense incurred as a result of the inaccuracy of those representations.[159]

We review a trial court's refusal to give a proposed jury instruction for abuse of discretion. Chunyk & Conley/Quad–C v. Bray, 156 Wn. App. 246, 252, 232 P.3d 564 (2010). We review alleged errors of law in a jury instruction de novo. Cox v. Spangler,

---

[157] CP at 1321.
[158] RP at 1815-16 (damages paid before trial).
[159] CP at 9040.

141 Wn.2d 431, 442, 5 P.3d 1265, 22 P.3d 791 (2000). "A trial court must instruct the jury on a party's case theory if substantial evidence supports it." Estate of Dormaier ex rel. Dormaier v. Columbia Basin Anesthesia, P.L.L.C., 177 Wn. App. 828, 851, 313 P.3d 431 (2013).

VPFK presented evidence at trial that the plans and specifications required VPFK to perform all interventions from inside the tunnel using slurry and compressed air, but the Contract did not provide for ground improvements. VPFK argues on appeal that "[t]his evidence supported the conclusion that the County breached its implied warranty that the tunnels could be dug using an STBM and *without* ground improvements. It also supported the conclusion that VPFK was entitled to the extra time and money required to make the ground improvements."[160] But VPFK neither established at trial nor on appeal that the lack of provision for ground improvements is a defective specification where the Contract does not prohibit the contractor from using ground improvements when conducting interventions. The Contract did not affirmatively prohibit VPFK from using ground improvements such that it impliedly warranted that the use of ground improvements was unnecessary for purposes of interventions. We affirm the trial court's refusal to give VPFK's implied warranty jury instruction.

## IV. Liquidated Damages

VPFK moved for partial summary judgment "to limit any recovery that King County may obtain to the contractually-specified liquidated damages, instead of the higher alleged actual damages that King County now seeks to recover."[161] The trial court denied VPFK's motion. VPFK challenges this ruling, arguing that the liquidated damages clause

---

[160] Br. of App. at 62.
[161] CP at 543.

of the Contract provided the exclusive remedy for any delays and the County could not recover for more than that amount. We disagree.

A contract is construed to give controlling weight to the parties' intent, as expressed in the contract's plain language. Western Plaza, LLC v. Tison, 180 Wn. App. 17, 22, 322 P.3d 1, review granted, 336 P.3d 1165 (2014). "[W]e view the contract as a whole, interpreting particular language in the context of [the] other contract provisions." Viking Bank v. Firgrove Commons 3, LLC, 183 Wn. App. 706, 713, 334 P.3d 116 (2014).

Section 10.7(A) of the Contract, which dealt with liquidated damages against VPFK, stated that the liquidated damages "amounts shall be construed as the actual amount of damages sustained by the County."[162]

Under the "Termination Provision" in Article 8 of the Contract, the County was permitted to terminate the Contract, or any part of it, upon the occurrence of any one or more of the nine specific events enumerated in that provision.[163] Section 8.0(A)(4) provided:

> The Contractor and its sureties shall be liable for all damages and costs, including but not limited to: (1) compensation for architect and engineering services and expenses made necessary thereby; (2) any other costs or damages incurred by the County in completing and/or correcting the Work; and (3) any other special, incidental or consequential damages incurred by the County which results or arises from the breach or termination for default.[164]

And Section 8.0(A)(7) further provided: "The rights and remedies of the County in this provision are in addition to any other rights and remedies provided by law or under this contract."[165]

---

[162] CP at 603-04.
[163] CP at 1453.
[164] CP at 1453.
[165] CP at 1453.

The Interim Agreement preserved these rights and remedies. It stated that the County "has the right to pursue a claim against VPFK based on the allegation that VPFK is in default and that King County's costs to complete the BT-3 tunnel that exceed $16,487,552[.00] were caused by that default."[166]

The County's claims were not limited to its assertion that VPFK was liable because it failed to complete its work on time. Instead, it brought a claim of default. Sections 8.0(A)(4) and (7) of the Contract allowed the County to recover "all damages" as a result of VPFK's default "in addition to any other rights and remedies" provided in the Contract.[167] The Contract did not limit the County's recovery to liquidated damages. The trial court properly denied VPFK's motion for partial summary judgment on this claim.

V.    Exclusion of Expert Witness Testimony

VPFK contends that the trial court erred by prohibiting VPFK's scheduling expert, Nessim Habashi, from giving opinion testimony that the County's delay damages were caused by a concurrent delay in completing repairs to defective pipes in the East Tunnel. We disagree and hold that even assuming the trial court erred by excluding this evidence, such error was harmless.

We review a trial court's admission or exclusion of expert testimony for abuse of discretion. Aubin v. Barton, 123 Wn. App. 592, 608, 98 P.3d 126 (2004) (citing Esparza v. Skyreach Equip., Inc., 103 Wn. App. 916, 924, 15 P.3d 188 (2000)). "A court abuses its discretion in admitting or excluding expert testimony when its decision is manifestly unreasonable or based on untenable grounds or reasons." Aubin, 123 Wn. App. at 608 (citing Hall v. Sacred Heart Med. Ctr., 100 Wn. App. 53, 64, 995 P.2d 621 (2000)).

---

[166] CP at 585.
[167] CP at 1453.

On September 10, 2012, VPFK moved to continue the trial to allow it time to review newly discovered evidence.[168] In the previous two weeks, VPFK discovered evidence that VPFK's delays were caused by concurrent problems on the East Tunnel that were connected to the main treatment plant.[169] VPFK submitted a document entitled, "Brightwater Project Construction Phase Oversight Monitoring Consultant Report," published by the Oversight Monitoring Consultant, King County Auditor's Office from August 24, 2012.[170] The document reported a "delay due to East Tunnel defect repair."[171] It stated that the East Tunnel pipe repair work was on "the critical path to Conveyance System commissioning."[172] VPFK also attached a copy of the County's April 2012 invitation to interested bidders to submit bids to fix leaking joints, cracked welds, and repair coating systems in the East Tunnel.[173] The court denied the motion to continue, but granted VPFK's request for additional discovery relating to the delay on the East Tunnel.[174]

On November 26, 2012, VPFK submitted an offer of proof to support its defense theory concerning concurrent delays.[175] VPFK sought to call Habashi to testify about his analysis of the project schedule, documented in a 43-page report.[176] In the report, Habashi concluded that the repair delays on the East Tunnel ran concurrently with VPFK's delays and that "contrary to the County's contention, the Central Tunnel delay did

---

[168] CP at 7406, 7421.
[169] CP at 7407.
[170] CP at 7422, 7424.
[171] CP at 7425.
[172] CP at 7427.
[173] CP at 7452.
[174] RP at 770, CP at 7649.
[175] CP at 9127.
[176] CP at 9128, 9178.

not delay the overall Project."[177] He found that in December 14, 2010, the County advised the East Tunnel contractor of certain problems with the grout ports in the pipes and that repairs would be needed.[178] Additional problems were found in the East Tunnel in June and July 2011, the time period during which the County alleged that VPFK delayed the project.

The County objected to the admission of VPFK's new evidence, arguing that VPFK could have learned about the delays before the discovery cut-off, but failed to do so, and that the evidence was irrelevant.[179] The trial court agreed, ruling that the only delays VPFK could address at trial were delays on the East Tunnel between September and October 2012.[180]

VPFK argues that the trial court abused its discretion because it reached a decision not supported by the facts and because it "excluded evidence for a reason inconsistent with its own rationale for allowing additional discovery on the concurrent delay issue."[181]

The County notes that VPFK did not timely disclose this evidence and argues that under local rules and case law, the untimely designation of a witness warrants exclusion of that witness. King County Local Rule 26(b)(4) (2011) provided, "Any person not disclosed in compliance with this rule may not be called to testify at trial, unless the Court orders otherwise for good cause and subject to such conditions as justice requires." In Scott v. Grader, 105 Wn. App. 136, 140, 18 P.3d 1150 (2001), this court held that "[a] party's untimely designation of a witness without reasonable excuse will justify an order

---

[177] CP at 9161-62.
[178] CP at 9147.
[179] RP at 5051-52.
[180] RP at 5051.
[181] Br. of App. at 78.

excluding the witness." We do not find this argument compelling. Here, VPFK listed Habashi as a witness; it was the scope of his testimony that changed. These authorities, however, apply to the identity of the witnesses, not to portions of a witness's testimony. They do not lend strong support to the County's argument.

The County also contends that Habashi's testimony was irrelevant. The County's claim for delay damages was based on VPFK's 18-month delay from March 2011 to September 2012.[182] Habashi would have testified that based on correspondence between the County and the East Tunnel contractor, between December 2010 and August 2012, repairs were needed on pipes in the East Tunnel, which was on the "critical path" to the start of the commissioning of the project.[183] The delays to the East Tunnel could have undercut the County's claim that VPFK was solely responsible for the delays during the 18-month period.

But even assuming without deciding that the trial court erred, VPFK has not shown that any prejudice resulted from the exclusion of Habashi's testimony. "An evidentiary error requires reversal only if it results in prejudice; only if it is reasonable to conclude that the trial outcome would have been materially affected had the error not occurred." Lutz Tile, Inc. v. Krech, 136 Wn. App. 899, 905, 151 P.3d 219 (2007).

The record shows that although the trial court excluded Habashi's testimony, it did not preclude VPFK from presenting its concurrent delay damages argument to the jury. VPFK elicited other testimony from Habashi in support of its argument that the East Tunnel repair work was a concurrent delay. VPFK then examined the County's witnesses about concurrent delays. It first questioned Judy Cochran, the County's employee in

---

[182] RP at 2476-77, 2500, 2550-51; CP at 4017.
[183] CP at 9147, 9150-51, 9167-68.

34

charge of Brightwater, about the project schedule, the East Tunnel pipe defects, and the impact of the repair work on the critical path for the project.[184] VPFK also examined the County damages expert about concurrent delays and the East Tunnel repair work.[185] VPFK reiterated its theory in closing argument[186] and the trial court instructed the jury on concurrent delays.[187]

Because VPFK was able to present its concurrent delay theory, we conclude that VPFK was not prejudiced by the trial court's exclusion of portions of Habashi's testimony. The trial court did not abuse its discretion.

VI.    Attorney Fees

Following entry of the jury verdict, the trial court awarded attorney fees and costs to the County pursuant to Olympic Steamship, Inc. v. Centennial Insurance Co., 117 Wn.2d 37, 811 P.2d 673 (1991) and Colorado Structures, Inc. v. Insurance Co. of the West, 161 Wn.2d 577, 167 P.3d 1125 (2007).[188] The Sureties contend that the County was not entitled to recover such fees. We disagree.

The question whether a party is entitled to attorney fees is an issue of law that we review de novo. Colorado Structures, 161 Wn.2d at 586.

Washington adheres to the "American rule," which holds that absent a contract, statute, or recognized equitable principle, attorney fees are not available as either costs or damages. City of Seattle v. McCready, 131 Wn.2d 266, 273-74, 931 P.2d 156 (1997). In Olympic Steamship, our Supreme Court recognized one such equitable principle. It

---

[184] RP at 5515-29.
[185] RP at 5935-39.
[186] RP at 7028.
[187] CP at 9115.
[188] CP at 4487.

held that "[a]n insured who is compelled to assume the burden of legal action to obtain the benefit of its insurance contract is entitled to attorney fees." Olympic Steamship, 117 Wn.2d at 54.

In Colorado Structures, 161 Wn.2d at 597-98, our Supreme Court expressly extended the Olympic Steamship rule to apply to an action by an obligee to recover on a performance bond, such that a surety that wrongfully denies coverage is liable for attorney fees. The court reasoned that the same rationale for awarding attorney fees in the insurance context applied with equal force in the surety context: "[G]iven the underlying principles of Olympic Steamship and the nature of a performance bond, which guarantees the performance of the principal, we fail to find a material distinction [between performance bonds and a traditional insurance policy]. Indeed, all surety bonds are regarded as 'in the nature' of insurance contracts, and controlled by the rules of interpretation of such contracts." Colorado Structures, 161 Wn.2d at 598. The court explained, "'[W]hen an insurer unsuccessfully contests coverage, it has placed its interests above the insured. Our decision in Olympic Steamship remedies this inequity by requiring that the insured be made whole.'" Colorado Structures, 161 Wn.2d at 607 (quoting McGreevy v. Or. Mut. Ins. Co., 128 Wn.2d 26, 39-40, 904 P.2d 731 (1995)). Our Supreme Court has also extended Olympic Steamship to apply to litigation expenses, including expert witness fees. Panorama Village Condo. Owners Ass'n Bd. of Dirs. v. Allstate Ins. Co., 144 Wn.2d 130, 144, 26 P.3d 910 (2001).

Here, the trial court's award of attorney fees and expenses was consistent with these cases. The County had to take legal action to obtain the benefit of the performance

bond. Under <u>Olympic Steamship</u> and <u>Colorado Structures</u>, the County was entitled to recover attorney fees from the Sureties.

Nevertheless, the Sureties contend that the equitable principles acknowledged in <u>Olympic Steamship</u> and <u>Colorado Structures</u> do not apply here, arguing that cases arising out of public works contracts are governed solely by a comprehensive statutory scheme— RCW 4.84.250 through .280, as modified by RCW 39.04.240 of the Public Works Act, chapter 39.04 RCW.

RCW 39.04.240(1) provides:

> The provisions of RCW 4.84.250 through 4.84.280 shall apply to an action arising out of a public works contract in which the state or a municipality, or other public body that contracts for public works, is a party, except that: (a) The maximum dollar limitation in RCW 4.84.250 [($10,000.00)] shall not apply. . . .

RCW 4.84.260 allows for an award of attorney fees to the "prevailing party":

> The plaintiff, or party seeking relief, shall be deemed the prevailing party within the meaning of RCW 4.84.250 when the recovery, exclusive of costs, is as much as or more than the amount offered in settlement by the plaintiff, or party seeking relief, as set forth in RCW 4.84.280.

The Sureties assert that this statutory scheme does not authorize a fee award here because the County was not the prevailing party; it never made a settlement offer to VPFK or the Sureties. But the Sureties fail to recognize that RCW 4.84.250 through .280, as modified by RCW 39.04.240, is not the exclusive means for a governmental entity to recover attorney fees in a dispute over a performance bond. The legislature did not intend for the statutory scheme to preclude the courts from applying equitable principles, such as those embodied in <u>Olympic Steamship</u>, to recover attorney fees in such circumstances.

The legislature has the authority to supersede, abrogate, or modify the common law. Potter v. Wash. State Patrol, 165 Wn.2d 67, 76, 196 P.3d 691 (2008). "However, we are hesitant to recognize an abrogation or derogation from the common law absent clear evidence of the legislature's intent to deviate from the common law." Potter, 165 Wn.2d at 76-77. A statute in derogation of the common law "is to be construed strictly, and limited to its purposes." Carson v. Fine, 123 Wn.2d 206, 214, 867 P.2d 610 (1994).

"If a remedy provided by a statute is exclusive, the statute implicitly abrogates all common law remedies within the scope of the statute." Potter, 165 Wn.2d at 79. To determine whether the statute provides an exclusive remedy, we consider whether the statute in question contains an express statement of exclusivity, its statutory language, and other expressions of legislative intent. Potter, 165 Wn.2d at 80. "In the absence of an express statement declaring a remedy to be exclusive, we require clear evidence that the legislature intended to abrogate the common law." Potter, 165 Wn.2d at 81 (citing In re Parentage of L.B., 155 Wn.2d 679, 695 n.11, 122 P.3d 161 (2005)).

Here, the language of the statutes does not explicitly convey the legislature's intent that RCW 39.04.240 be the exclusive method of recovering attorney fees in a dispute over a performance bond in a case arising out of public works contracts. We decline to hold that the legislature intended to abrogate the equitable power of courts in awarding attorney fees under the common law principles set forth in Olympic Steamship and Colorado Structures in cases arising from public works contracts.

The Sureties next argue that an award of fees would be inequitable because neither the Contract Documents nor the Bond provides for recovery of attorney fees. They argue that VPFK had no notice that it would be liable for attorney fees, unlike Colorado

38

Structures, and thus, VPFK had no opportunity to plan its litigation strategy to minimize its risk that it would have to pay attorney fees. This argument lacks merit. "[I]t has long been held to 'be the universal law that the statutes and laws governing citizens in a state are presumed to be incorporated in contracts made by such citizens, because the presumption is that the contracting parties know the law.'" Cornish Coll. of the Arts v. 1000 Va. Ltd. P'ship, 158 Wn. App. 203, 223-24, 242 P.3d 1 (2010) (quoting Leiendecker v. Aetna Indem. Co., 52 Wash. 609, 611, 101 P. 219 (1909)). Our Supreme Court's decisions in Olympic Steamship and Colorado Structures are well settled law. The Sureties cannot now argue that they lacked notice of their potential liability for attorney fees and costs when they improperly denied the County's claims against the Bond.

The Sureties next contend that even if the trial court properly awarded attorney fees, the trial court erred by failing to segregate fees incurred in litigating coverage disputes from those incurred in litigating non-coverage disputes. We disagree.

We review a trial court's decision regarding the segregation of attorney fees for abuse of discretion. Loeffelholz v. Citizens for Leaders with Ethics & Accountability Now (C.L.E.A.N.), 119 Wn. App. 665, 690, 82 P.3d 1199 (2004).

Here, the trial court found that "[t]hroughout the litigation, the Sureties adopted VPFK's defenses, including VPFK's claims for differing site conditions (DSCs) that VPFK claimed were overlapping and interconnected and not capable of segregation for purposes of calculating damages."[189] The Sureties do not contest this finding.

The trial court then entered the following conclusions of law, which the Sureties challenge:

---

[189] CP at 4487.

19. King County's claim of default against VPFK and the Sureties involved a common core of facts. Since the Sureties denied coverage and adopted all of VPFK's defenses, the claims could not and were not required to be segregated.

20. The Sureties adopted all of VPFK's defenses in this case, including claims for various differing site condition (DSC) claims, which, if proved in their entirety, would defeat King County's claim of default. The work King County did prosecuting its default claim against VPFK was also directly attributable to the Sureties, and the fee award cannot reasonably be segregated as between VPFK and the Sureties. *See Fiore v. PPG Indus., Inc.*, 169 Wn. App. 325, 352, 279 P.3d 972, 987 (2012) . . . .

21. The jury found for RCO 65 and 66 (the two largest awards to VPFK) that VPFK was "not capable of segregating its damages...because of the overlapping and interconnected nature of the claims." . . . Where, as here, the claims are so related that "no reasonable segregation of successful and unsuccessful claims can be made, there need be no segregation of attorney fees." *Loeffelholz*[,119 Wn. App. at 691.][190]

"If attorney fees are recoverable for only some of a party's claims, the award must properly reflect a segregation of the time spent on issues for which fees are authorized from time spent on other issues," even where the claims overlap or are interrelated. Mayer v. City of Seattle, 102 Wn. App. 66, 79-80, 10 P.3d 408 (2000); Loeffelholz, 119 Wn. App. at 690. But segregation of attorney fees is not required if the trial court determines that the claims are so related that no reasonable segregation of successful and unsuccessful claims can be made. Loeffelholz, 119 Wn. App. at 691. Where the "'plaintiff's claims for relief . . . involve a common core of facts or [are] based on related legal theories,' a lawsuit cannot be 'viewed as a series of discrete claims' and, thus, the claims should not be segregated in determining an award of fees." Fiore, 169 Wn. App. at 352 (internal quotation marks omitted) (quoting Brand v. Dep't of Labor & Indus., 139

---

[190] CP at 4489.

Wn.2d 659, 672-73, 989 P.2d 1111 (1999)); see also Bloor v. Fritz, 143 Wn. App. 718, 747, 180 P.3d 805 (2008) (trial court was not required to segregate fees where "claims arose out of the same set of facts" and it was "virtually impossible" to segregate fees).

Olympic Steamship and Colorado Structures fees are available when the insurer or surety unsuccessfully denies coverage. See Solnicka v. Safeco Ins. Co. of Ill., 93 Wn. App. 531, 533, 969 P.2d 124 (1999); Axess Int'l Ltd. v. Intercargo Ins. Co., 107 Wn. App. 713, 721, 30 P.3d 1 (2001); Colorado Structures, 161 Wn.2d at 606. But such fees are not available if the dispute is merely about the value of the claim. Solnicka, 93 Wn. App. at 533. In other words, attorney fees are available in cases involving coverage disputes, which generally concern interpretation of the meaning or application of a policy or bond. Colorado Structures, 161 Wn.2d at 606. In contrast, claim disputes "raise factual questions about the extent of the insured's damages. They involve factual questions of liability, injuries, and damages." Solnicka, 93 Wn. App. at 534 (citations omitted).

Olympic Steamship "has been read broadly by Washington courts. . . . The only articulated limitation to this rule is that no fees are awarded when the insurer does not dispute coverage, but merely disputes the value of the claim." Nordstrom, Inc. v. Chubb & Son, Inc., 54 F.3d 1424, 1437 (9th Cir. 1995) (citations omitted). Thus, the "claims dispute" exception to Olympic Steamship attorney fees is narrow. It applies where the surety or insurer acknowledges coverage, agrees to pay under the policy or bond, but disputes the value of the claim.

Here, the Sureties did not acknowledge that VPFK was in default, denied that the County was entitled to recover under the Bond, and did not agree to pay under the bond. In other words, it flatly denied coverage under the Bond, forcing the County to compel it

to honor its commitment to do so. Because the Sureties denied liability when it expressly adopted VPFK's defenses, the County could only obtain the benefit of the Bond by defeating VPFK's defenses. The Sureties' claims arose out of the same set of facts and were based on related legal theories and defied segregation. The trial court did not abuse its discretion when it determined that the attorney fees could not be segregated.

VII.    Joint and Several Liability

The Sureties contend that the trial court erroneously instructed the jury that the Sureties would be jointly and severally liable for all of the County's damages.[191] The Sureties assert that the Bond contained no provision requiring the Sureties to compensate the County for all consequential damages flowing from VPFK's breach of contract, and that the Bond did not make the Sureties jointly and severally liable with VPFK. We disagree.

The Bond expressly incorporated by reference all of the Contract Documents.[192] Under the "Termination Provision" in Article 8 of the contract, the County is permitted to terminate the contract, or any part of it, upon the occurrence of any one or more of the nine specific events enumerated in that provision.[193] Section 8.0(A)(4) of the contract provided:

> **The Contractor and its sureties shall be liable for all damages and costs, including but not limited to**: (1) compensation for architect and engineering services and expenses made necessary thereby; (2) any other costs or damages incurred by the County in completing and/or correcting the Work; and (3) **any other special, incidental or consequential damages incurred by the County which results or arises from the breach or termination for default**.[194]

---

[191] CP at 9112.
[192] Ex. 3001 at 1.
[193] CP at 1453.
[194] CP at 1453 (emphasis added).

The Contract rendered the Sureties and VPFK liable for *all* damages, including consequential damages resulting from VPFK's breach. The trial court did not err in instructing the jury that the Sureties are also liable for breach of obligations under the Bond.

## VIII.   VPFK's Cross Appeal

Following trial, the County moved for judgment as a matter of law on VPFK's claims for "extended repair of rim bar."[195] The County cross appeals the trial court's denial of its motion.

Under CR 50, a trial court may enter judgment as a matter of law if, "during a trial by jury, a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find or have found for that party with respect to that issue." "A trial court appropriately denies a motion for judgment as a matter of law if, viewing the evidence most favorably to the nonmoving party, it can say as a matter of law that there is substantial evidence to sustain the verdict for the nonmoving party." Bishop of Victoria Corp. Sole v. Corp. Bus. Park, LLC, 138 Wn. App. 443, 453, 158 P.3d 1183 (2007). The trial court's ruling is reviewed de novo. Bishop of Victoria Corp. Sole, 138 Wn. App. at 454.

At the time VPFK discovered damages to the rim bar, both STBMs were in locations where the pressure was higher than 75 psi.[196] VPFK had to dewater the BT-2 tunnel, reduce the pressure, create a safe haven, and repair the machine.[197] It also dewatered and created a safe haven in the BT-3 tunnel to repair the STBM there.[198] After

---

[195] CP at 1328, 1335.
[196] RP at 1749-50.
[197] RP at 1985-86.
[198] RP at 5131-32.

hiring JDC to complete the BT-3 alignment, the County instructed VPFK not to complete the BT-3 repairs.[199]

VPFK submitted RCOs 85 and 86, seeking $23,946,605.00 in repair costs and two time extensions.[200] VPFK's claim was predicated in part on its position that the costs of creating artificial safe havens were much higher than anticipated because the ground conditions were materially different from what was in the Contract Documents, and despite its increased efforts to reduce the pressure in those locations, the pressure could still not be reduced to atmospheric conditions.[201]

VPFK sought compensation for its costs in this litigation, and the jury found that "VPFK proved a Type I differing site condition based on soils at the location where the [BT-2 and BT-3] rim bar[s] [were] repaired."[202] The jury awarded VPFK damages totaling $8,297,551.00.[203]

The County contends that the trial court erred because the Contract Documents made no representation regarding soil conditions at locations where VPFK repaired the damaged rim bars. But VPFK's claim was not based on the soil conditions it encountered. It introduced evidence that, based on the Contract Documents, it should have been able to find a natural safe haven to repair the rim bar that was located close to where the machines were damaged.[204] VPFK also introduced evidence that it had to build artificial safe havens, through a process of dewatering, to perform the repairs.[205] Moreover, VPFK

---

[199] RP at 3201-02, 4132; Ex. 152 at 115, Ex. 161 at 244.
[200] Ex. 1830 at 55.
[201] Ex. 1830 at 43.
[202] CP at 4552-53.
[203] CP at 4552-53.
[204] RP at 3185-87; Ex. 1830 at 3.
[205] Ex. 1830 at 3-4, 9-10.

presented evidence that the pressure at the locations where the artificial safe havens were built exceeded 75 psi, "which would not have been expected given anticipated impermeable nature of the present soils," contrary to the representations in the Contract Documents.[206] Thus, substantial evidence supported the jury's finding that VPFK encountered a Type I differing site condition.

The County next contends that no evidence supported the jury's award of substantial damages. The jury instruction regarding the repair of the rim bar stated:

> **Repair of Rim Bar.** VPFK claims the Contract Documents indicated that atmospheric conditions could be found in full face teal. VPFK claims the location of the rim bar repairs for both [tunnel boring machines] was in full face teal but atmospheric conditions could not be achieved, which extended the repair time. VPFK believes this is a Type I differing site condition.[207]

The County points to the GBR, in which it represented that the teal TSG would provide "up to 24 hours of stand-up time" before becoming unstable.[208] The County argues that VPFK did not show at trial that its repair costs would have been different if the soils at the repair locations had stood up for 24 hours and then become unstable. The beginning of jury instruction 9 advised the jury that the instruction was a "summary of claims of the parties provided to help you understand the issues in the case."[209] The instruction did not contain a complete explanation of the parties' claims.

In any event, VPFK presented substantial evidence that it incurred high costs as a result of the differing site conditions it encountered when repairing the STBMs. To create safe havens, VPFK pumped water from the ground and had to find a way to dispose of

---

[206] Ex. 141 at KC0091636, Ex. 1699 at KC0091479; RP at 2690.
[207] CP at 9098.
[208] Ex. 7 at 13.
[209] CP at 9091.

it.[210] To drill from the surface and install surface pumps, VPFK had to obtain permits.[211] Through its submission of RCOs 85 and 86, VPFK documented all of its efforts to repair the rim bars.[212] The jury weighed this evidence and determined VPFK's damages to be $8,297,551.00[213] The trial court did not err by denying the County's motion for judgment as a matter of law.

IX.    Attorney Fees on Appeal

The County requests attorney fees on appeal. Pursuant to RAP 18.1, a party may be awarded attorney fees and costs on appeal "if applicable law grants to a party the right to recover reasonable attorney fees or expenses." The County relies on Olympic Steamship and Colorado Structures. Because the County is the prevailing party on appeal, we grant its request for appellate costs and reasonable attorney fees.

We affirm.

Trickey, J

WE CONCUR:

---

[210] RP at 781, 1357, 5123-24.
[211] Ex. 142 at VPFK EM 00171389; RP at 1984.
[212] Ex. 1830 at KC0133049-54.
[213] CP at 4552-53.